```
1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                              EASTERN DIVISION

3    ANTONIO PAVONE, on behalf of himself ) Docket No. 15 C 1539
     and all others similarly situated,   )
4                                          )
                             Plaintiff,    )
5                                          )
                  vs.                      )
6                                          )
     MEYERKORD & MEYERKORD, LLC, a         )
7    Missouri Limited Liability Company,   )
     et al.,                               ) Chicago, Illinois
8                                          ) October 12, 2016
                             Defendants.   ) 8:38 o'clock a.m.
9
                     TRANSCRIPT OF PROCEEDINGS - STATUS
10                  BEFORE THE HONORABLE AMY J. ST. EVE

11   APPEARANCES:

12   For the Plaintiff:        ZAMPARO LAW GROUP, PC
                               BY:  MR. ROGER ZAMPARO, JR.
13                             2300 Barrington Road, Suite 140
                               Hoffman Estates, Illinois  60169
14
     For Meyerkord & Meyerkord: BARNOW AND ASSOCIATES, P.C.
15                             BY:  MR. ERICH P. SCHORK
                               1 North LaSalle St., Suite 4600
16                             Chicago, Illinois  60602

17   For LexisNexis and        TROUTMAN SANDERS, LLP
     iyeTek:                   BY:  MR. TYLER S. MERTES
18                             55 West Monroe Street, Suite 3000
                               Chicago, Illinois  60603
19
     Court Reporter:           MR. JOSEPH RICKHOFF
20                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
21                             Chicago, Illinois  60604
                               (312) 435-5562
22

23              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                         PROCEEDINGS RECORDED BY
                           MECHANICAL STENOGRAPHY
25                   TRANSCRIPT PRODUCED BY COMPUTER
```

1          THE CLERK:  15 C 1539, Pavone vs. Meyerkord &

2     Meyerkord.

3          MR. MERTES:  Good morning, your Honor, Tyler Mertes

4     for defendants LexisNexis and iyeTek.

5          THE COURT:  Good morning.

6          MR. SCHORK:  Good morning, your Honor, Eric Schork

7     for defendant Meyerkord & Meyerkord, LLC.

8          MR. ZAMPARO:  Good morning, your Honor, Roger

9     Zamparo, Jr., on behalf of the plaintiffs.

10          THE COURT:  You are here for status.  What is the

11     status, and have you taken the depositions of the Schaumburg

12     Police Department officers yet?

13          MR. ZAMPARO:  May I?

14          MR. MERTES:  Sure.

15          MR. ZAMPARO:  Yes, we have completed the Schaumburg

16     Police Department, thankfully, Judge.

17          THE COURT:  Okay.

18          MR. ZAMPARO:  So, that is done.  We're just waiting

19     on the transcripts on that.

20          Shortly after last week's court appearance, we sent

21     letters to defense counsel seeking to try to work out the

22     discovery dispute issues.  Very detailed letter.  We sent it

23     within hours of the court hearing.  Unfortunately, we only got

24     a little bit of information back on Friday, and the rest of

25     the response came in at 1:00 o'clock yesterday.

1        Nevertheless, we worked until about 8:00 p.m. last

2   night trying to resolve the issues.  Unfortunately, they have

3   not been resolved.

4        We're going to have to file a detailed and extensive

5   motion to compel.  We'd respectfully ask the Court to consider

6   allowing us to do that within ten days.  We still need a

7   transcript or two.  I can give some more detail to the Court,

8   if you'd like, on some of the issues, for example, that we're

9   waiting.

10       But both sides, I will say, you know, tried hard to

11  resolve these issues, and they just don't seem to be

12  resolvable at this point.  But we don't mind continuing to

13  try.  But we won't delay anymore, if we can file our motion to

14  compel within ten days.  If the Court should allow that, we'd

15  respectfully request pushing out the other dates to 60 days

16  from today.

17           THE COURT:  I am not inclined to do that.

18           MR. ZAMPARO:  Yes, your Honor.

19           THE COURT:  What are the issues in your motion to

20  compel?

21           MR. ZAMPARO:  Example:  Meyerkord's 30(b)(6) witness

22  testified that they used a gentleman by the name of Jedediah

23  Wilson.  It was a marketing-type consultant who actually had

24  the contract with iyeTek and the other defendants to get the

25  records.  They -- he also --

```
 1              THE COURT:  To get the Secretary of State records?

 2              MR. ZAMPARO:  From the defendants, correct.

 3              He was --

 4              THE COURT:  For the defendants or from the

 5    defendants?

 6              MR. ZAMPARO:  From the defendants.

 7              THE COURT:  Okay.

 8              MR. ZAMPARO:  The contract was in Jedediah's name

 9    even, as an agent, I guess, of Meyerkord.

10              Meyerkord's answers to interrogatories say they had

11    over 7,000 reports, some of which are from another company;

12    but the bulk, we thought, were from the defendants.

13              We asked for the records regarding Jedediah Wilson

14    since, when they produced the Meyerkord records, they gave us,

15    like, 400 and change, not the 7,000 that Meyerkord said they

16    had.  We asked them to check on the records for Jedediah

17    Wilson.  We can't find anything on that.  Yet their 30(b)(6)

18    says, we can pull records on anybody regarding any sales

19    pursuant to lot.

20              We don't have that information.  They won't give it

21    to us.

22              THE COURT:  So, what are the 7,000 reports that

23    Meyerkord has?

24              MR. ZAMPARO:  Traffic accident reports from the

25    Secretary of State's Office.
```

1          THE COURT:  For what period of time?

2          MR. ZAMPARO:  We were asking for 24 hours from the

3     time of the accident.  Their deposition now indicated that

4     there might be a little bit of a lag because the reports don't

5     get to the system right away.  So, we've expanded that for a

6     few hours by just modifying the words to ask for --

7          MR. SCHORK:  Your Honor, if I may --

8          THE COURT:  So, wait -- no, no, hold on.

9          7,000 reports for a 24-hour period?

10         MR. ZAMPARO:  That's what Meyerkord testified they

11    pulled from iyeTek.

12         MR. MERTES:  That's not --

13         MR. SCHORK:  That's not right, your Honor.

14         THE COURT:  That sounds like a lot of accident

15    reports in a 24-hour period.

16         MR. ZAMPARO:  No, they didn't pull it.  All reports

17    from -- that -- I misstated it.

18         The reports were requested for any report pulled that

19    they received, the report was issued 24 hours after an

20    accident.  They didn't all get them at once.  There wasn't

21    7,000 that we --

22         MR. SCHORK:  No --

23         MR. ZAMPARO:  -- submitted at once.

24         MR. SCHORK:  -- that's not right, your Honor.

25         My recollection -- and I know that 24 hours wasn't a

1     determinant in that field.  My understanding was that -- and I

2     don't have the document in front of me, but my understanding

3     and recollection was that the 7,000 figure relates to number

4     of individuals who received mailings in Illinois which would

5     have included a traffic accident report, but the 24 hours was

6     not a qualifier.  That's, you know, within a five-year period

7     essentially.

8               THE COURT:  Within a five year period.  Okay.

9               So, these --

10              MR. SCHORK:  Yes.

11              THE COURT:  -- are individuals who your client sent

12    mailings to regarding a traffic accident during this five-

13    year period?

14              MR. SCHORK:  That is my understanding.

15              THE COURT:  Potential class members.

16              MR. SCHORK:  Potentially.

17              MR. MERTES:  Well --

18              MR. SCHORK:  Well, I mean --

19              MR. MERTES:  If I can interject, we're talking about

20    two different things now.  In terms of what his client may

21    have sent and with respect to Jedediah Wilson and the total

22    number of crash reports generated by my client, those are --

23    let's not conflate those.  Those are two separate things.

24              THE COURT:  I have not gotten to your client yet, so

25    --

1          MR. MERTES:  Yeah, no, and he's --

2          MR. SCHORK:  Yeah, and --

3          MR. MERTES:  He's somewhat talking -- he's talking

4   about issues with my client.

5          MR. SCHORK:  Yeah.  And I will say --

6          MR. ZAMPARO:  Right.

7          MR. SCHORK:  If I can just finish for a second.

8          There was another platform that our client used for a

9   short period of time.  And he did -- our client also got some

10  records directly from certain police departments within the

11  state, and he testified to that at his deposition.

12         But, also, Jed Wilson was in our initial disclosures

13  filed in November of 2- -- last year.  So, I guess I'm

14  surprised that, you know, they're seeking more information on

15  this individual right now and --

16         THE COURT:  Tell me what Jed Wilson's role was here.

17         MR. SCHORK:  Jed Wilson was a contractor that was

18  hired by Meyerkord & Meyerkord, LLC, to essentially pull the

19  actual traffic reports.  That was -- and stuff envelopes in

20  my --

21         THE COURT:  Pull the traffic reports from, where?

22         MR. SCHORK:  They would pull traffic reports from --

23  I believe there were two different systems that were used.

24  And they also obtained some reports directly from certain

25  police departments.

 1          THE COURT:  When you say pull from two different

 2   systems, are those systems at your client's company or are

 3   these separate systems from your company?

 4          MR. SCHORK:  No, no, those would be systems -- one of

 5   the systems was -- we're talking platforms.  One of them was

 6   Authorizedtransaction.com, which is -- was owned by iyeTek,

 7   which is one of the defendants.

 8          THE COURT:  Okay, because I just heard from plaintiff

 9   something different -- that Jedediah Wilson was there to get

10   Secretary of State records from you.

11          MR. ZAMPARO:  No, no.  Let me clarify this.

12          We have no dispute with Meyerkord.  The dispute is

13   with Mr. Mertes' client.

14          THE COURT:  Here is part of the problem.  You do not

15   know what you are asking for.  You cannot --

16          MR. ZAMPARO:  Well, we do -- we have --

17          THE COURT:  Wait.  Wait.

18          MR. ZAMPARO:  Yes.

19          THE COURT:  How can you move to compel when you do

20   not know what you are asking for?  I have now spent five

21   minutes and I do not know what you are asking for.  Help me

22   out here.

23          MR. MERTES:  Your Honor, here's part of the problem.

24   We have provided them information related to -- they sent us a

25   bullet point e-mail, which we responded to with bullet points.

```
 1                THE COURT:  Plaintiff sent you a bullet point --
 2                MR. MERTES:  Correct.
 3                Some of the information we simply don't have.  And
 4      we've provided answers.  We've directed them to documents that
 5      have been produced or that were supplementally produced.  And,
 6      frankly, from my standpoint, the issue is I don't think they
 7      like some of the answers they're getting.  But I'm not sure
 8      that's going to change.  My client can't, you know, generate
 9      documents that don't exist.
10                THE COURT:  What is it that they are seeking from you
11      that you are not turning over?
12                MR. MERTES:  Well, there's a number of categories.
13      They want certain marketing materials that we don't have, that
14      iyeTek didn't use.  This wasn't the type of service that was
15      marketed the way --
16                THE COURT:  So, wait a minute.  So, let's talk about
17      marketing materials.
18                Is that something you are going to move to compel on?
19                MR. ZAMPARO:  Yes, your Honor.
20                THE COURT:  What marketing materials are you seeking?
21                MR. ZAMPARO:  Regarding their materials selling both
22      their two platforms to the police departments and other users,
23      basically.
24                THE COURT:  So, marketing that they use to sell the
25      police reports at issue in this case?
```

1           MR. ZAMPARO:  Yes, your Honor.

2           THE COURT:  Do you have such materials?

3           MR. MERTES:  We don't have such materials.

4           The other thing, Judge, that I would like to bring

5    the Court's attention to is, we did file a stipulation earlier

6    in this case, that your Honor might recall, that limited the

7    scope of discovery.  And marketing was one of the issues that

8    was addressed in that stipulation.  There aren't documents

9    that they believe --

10          THE COURT:  Do you market to sell these police

11   reports?

12          MR. MERTES:  We don't market to defendant law firms.

13   We market to certain police departments.

14          THE COURT:  And are you seeking marketing to police

15   departments; and, if so --

16          MR. ZAMPARO:  We're seeking all marketing.

17          THE COURT:  -- what is the relevance?

18          MR. ZAMPARO:  We have a deposition in the other case

19   against Mancini, that Judge Kennelly is handling, and Mr. --

20          THE COURT:  I am not worried about that.

21          MR. ZAMPARO:  But he --

22          THE COURT:  Discovery here does not pertain to that.

23          MR. ZAMPARO:  But his testimony, Judge, did say that

24   the rep from Mr. Mertes' client were showing them how to pull.

25   That's marketing.  I mean, direct sales is marketing.

1          I mean, we just -- we know Meyerkord said that they

2    pulled -- or they sent out 7,000-plus letters with traffic

3    accident reports.  We get from them 400 and change.  What

4    happened to the rest?

5          THE COURT:  When you say "from them," who are you

6    referring to?

7          MR. ZAMPARO:  IyeTek and LexisNexis.

8          MR. MERTES:  Judge, what they -- materials they're

9    seeking from us are information relating to our marketing to

10   -- not to this defendant; to Schaumburg Police Department,

11   other police departments.  The --

12         THE COURT:  So, let me come back to that.  What is

13   the relevance of their marketing to police departments?

14   Police departments are not defendants here.

15         MR. ZAMPARO:  The relevance is as to what they're

16   telling these attorneys.

17         THE COURT:  No, no, no.  The marketing -- listen to

18   my question.  Not marketing to defendants.  What is the

19   relevance of any marketing to police departments?

20         MR. ZAMPARO:  We don't know who they're marketing to,

21   Judge.  Let's put it this way.

22         THE COURT:  Okay.  Listen to my question.

23         You are asking for marketing materials to police

24   departments.  Putting aside any other marketing and you do not

25   know who they are marketing to, you have asked for any

1   marketing materials to police departments.  What is the

2   relevance of that to your claim in this case?

3           MR. ZAMPARO:  As to how the data is getting from the

4   Secretary of State's Office in violation of the DPPA.

5           THE COURT:  To the police departments, though.  What

6   is the violation there?  That is not what is at issue here.

7           MR. ZAMPARO:  I'm sorry.  I'm not being eloquent

8   enough, Judge.  I guess I'm confused myself.

9           THE COURT:  Okay.

10          You do not have to turn that over.

11          MR. MERTES:  Okay.

12          THE COURT:  So, do not file a motion to compel on

13  that.  There is no --

14          MR. ZAMPARO:  Yes, your Honor.

15          THE COURT:  -- relevance to that.

16          What else?

17          MR. MERTES:  The next general topic, Judge, is what

18  we call input data, which is --

19          THE COURT:  Before we move on to input, are there any

20  other marketing issues -- any other marketing material issues?

21  You said they were seeking from you marketing materials.

22          MR. MERTES:  Right.  There aren't -- and just for the

23  record, our 30(b)(6) witness testified about this and certain

24  documents were produced that go to the topic.

25          But I don't -- as I understand it, based on the

1    e-mail they sent to us, there aren't any more marketing

2    materials other than what we've just discussed right now.

3              THE COURT:  You do not have to turn over any

4    marketing materials to police departments.  To the extent you

5    have any marketing materials to Meyerkord & Meyerkord and you

6    have not produced those, turn those over a week from today if

7    they exist.

8              MR. MERTES:  Okay.

9              THE COURT:  What is the next topic?

10             MR. ZAMPARO:  Your Honor, may I ask also that

11   Jedediah Wilson, since he was an agent of --

12             MR. MERTES:  We've already advised them we do not

13   have any records relating to Jedediah Wilson.

14             THE COURT:  Okay.

15             They have stated it on the record, so I will accept

16   that.

17             What is the next category?

18             MR. ZAMPARO:  May I refute that for one minute,

19   Judge?

20             THE COURT:  No.

21             What is the next category?

22             MR. MERTES:  The next category on the e-mail is

23   called input data.

24             Our objection to this was based on it seeks all

25   records.  Our contention is that the request is overbroad and

1    outside the scope of the discovery stipulation we're

2    currently -- we -- or previously entered into.  Excuse me.

3            THE COURT:  What is input data?  How is that defined?

4            MR. MERTES:  As I understand, it's search criteria

5    that a department has to use to purchase a particular traffic

6    report.

7            THE COURT:  A police department?

8            MR. MERTES:  Correct.

9            THE COURT:  Or a lawyer, law firm defendant?

10           MR. MERTES:  A police department.

11           MR. SCHORK:  If I could, you know, just from the --

12           MR. MERTES:  I'm sorry.

13           MR. SCHORK:  I was at the depositions, and --

14           MR. MERTES:  Right.

15           MR. SCHORK:  -- what was testified to at his clients'

16   depositions was that the system is -- that's the iyeTek system

17   is -- tailored to -- because Illinois is, for instance, an

18   open records state, police departments can say, well, we want

19   someone to have this information or that information when

20   pulling a report, or all reports can be searchable.  And

21   that's an option for them.

22           So, for instance, they can require that someone has a

23   name and address and an accident report number or they can

24   just say, you know, anybody can access the report.  It's

25   within their discretion.  That was what was testified to.

1          MR. MERTES:  And documents were produced in this

2   regard, but both the -- relative to this Schaumburg Police

3   Department report related to plaintiff, and then also more

4   generally, additional documents produced on that issue, as

5   well.

6          THE COURT:  So, I still do not understand.  What is

7   it -- do you create these documents?  I thought the Secretary

8   of --

9          MR. MERTES:  No.

10         THE COURT:  -- State created them.

11         MR. MERTES:  Right.  Someone other than us creates

12   the documents.  You can -- certain people or entities can

13   purchase the documents through our service.

14         MR. SCHORK:  The documents can be created through a

15   number of means.  I mean -- and here's one of the issues,

16   honestly, that will be coming up in the case, is that, you

17   know, when filling out a traffic accident report, police

18   officers can get the information verbally and put it into the

19   report.  They can type it in themselves.  Police officers can

20   get the information from a variety of databases, one of which

21   is likely the Secretary of State database.  Another one is the

22   NCIS --

23         THE COURT:  NCIC.

24         MR. SCHORK:  -- NCIC database they all have in their

25   vehicles and, honestly, a number of other sources.

1          THE COURT:  Including Lexis?

2          MR. MERTES:  No.  We take the reports and allow them

3    to be purchased by third parties.

4          THE COURT:  Not by police departments, not by law

5    enforcement?

6          MR. MERTES:  Right.  Police departments can provide

7    the reports, for example.  I mean, it's the Schaumburg Police

8    Department report that's at issue with respect to plaintiff.

9    So, that's an example.

10          THE COURT:  They can provide the report to whom?

11          MR. MERTES:  To our client.

12          THE COURT:  Okay.

13          MR. SCHORK:  And the eCrash system from iyeTek is in

14   certain vehicles -- police vehicles -- which allows police

15   departments to type information into forms or even link with

16   the national crime database or the, you know, 18 other

17   databases thereto or certain DMV databases.

18          So, it speeds up the typing in of the report, and

19   then the storage goes to --

20          THE COURT:  So, what is the input data that you are

21   looking for?

22          MR. ZAMPARO:  Anything they have on it.  The

23   testimony, Judge --

24          THE COURT:  Anything they have on, what?

25          MR. ZAMPARO:  On how the input is done.

1        THE COURT:  How what input is done?  We need

2   specifics here.

3        MR. ZAMPARO:  The crash --

4        THE COURT:  How Lexis', iyeTek's input?

5        MR. ZAMPARO:  No.  How people that are buying the

6   reports can do it.

7        For example, Judge, it was -- and we have e-mails

8   from their internal staff saying that they're going to correct

9   the situation.  Meyerkord's, any attorneys, could go in and

10  actually search the data by severity of the injury.  They

11  don't even need a person's name or a police report or an

12  accident location.  They can search by severity of injury in

13  three different categories.

14       We want to get more information on how that input --

15  how they're allowing people to do that and get full access to

16  the entire traffic accident report.  That's what Meyerkord, in

17  fact, testified.  He was using Level -- I forget the exact

18  one, but Level 3 because he only wanted cases that had more

19  significant injuries; and he would search by that and pull out

20  all these reports.

21       MR. MERTES:  And there's been testimony to that

22  effect, and there's been documents produced to that effect,

23  that go to that question.

24       MR. SCHORK:  And this is -- and I don't believe

25  that's what my client testified to.

1      MR. ZAMPARO:  I'm paraphrasing, Judge.

2      MR. SCHORK:  I believe that my client testified to

3  the fact that the level of injury was one of the categories

4  they used in deciding who would receive a mailing.  I don't

5  know that it was a search criteria.  I don't believe it was,

6  actually.

7      THE COURT:  So, have you turned over documentation

8  regarding searchable terms or searchable categories?

9      MR. MERTES:  Yes.  And our objection is with respect

10  to the breadth of the -- so, we provided the search criteria

11  that would be used to search the Schaumburg Police Department

12  report, which is what is obviously at issue with respect to

13  the plaintiff.  And what they want is all records reflecting

14  input data, which it's unclear how that would relate to this

15  case; and it's difficult to understand exactly what they want

16  and how it would relate to where we're at here at this point.

17      MR. SCHORK:  And this was testified to extensively at

18  the Lexis and iyeTek depositions, which took place a few weeks

19  ago in Atlanta.  I mean, one of the witnesses was involved in

20  designing the system.  So, I don't -- I mean, I'm not --

21      MR. ZAMPARO:  And that --

22      MR. SCHORK:  -- sure what they're looking for.

23      MR. ZAMPARO:  And that's exactly what we're relying

24  on.  The 30(b)(6) witness specifically said, oh, I can get all

25  that.  To any question that Mr. Soumilas asked, I can get that

 1  information no problem.  Previous --

 2          THE COURT:  That does not mean it is relevant or

 3  proportional just because a --

 4          MR. ZAMPARO:  But the --

 5          THE COURT:  -- witness said it.

 6          MR. ZAMPARO:  -- previous answers were that they --

 7          THE COURT:  Please stop talking over me.  You are

 8  making Joe's job very difficult.

 9          MR. ZAMPARO:  My apologies, Judge.

10          THE COURT:  Beyond search terms or search

11  capabilities by the Schaumburg Police Department and by law

12  firms such as the defendant, what else is it that you are

13  seeking here?

14          MR. ZAMPARO:  Again, I don't have the specific

15  interrogatories in front of me, Judge.  They told us in their

16  original answers they did not have such information; it

17  doesn't exist.  The 30(b) witness testified they do exist and

18  we can run it.  And we're asking them to run the reports he

19  said he could run, that we previously asked for.

20          MR. MERTES:  The documents have been produced that

21  demonstrate the search criteria for the Schaum- --

22  necessary -- or what you can look at when you're pulling a

23  Schaumburg police report.  There are also other --

24          THE COURT:  Is it limited to these search criteria

25  for the Schaumburg report at issue here or all search criteria

1    that the Schaumburg Police Department can use?

2            MR. MERTES:  My understanding is it's the search

3    criteria for all Schaumburg police reports and --

4            THE COURT:  Make sure that has been turned over.

5            I am sorry.  And, what?

6            MR. MERTES:  And the general -- I also understand

7    there's documents that reflect the general search criteria for

8    other law enforcement agencies that are able to put stuff onto

9    our system.

10           THE COURT:  Okay.  To the extent that has not been

11   turned over, that should.  So, any search criteria that the

12   Schaumburg Police Department can use not just limited to this

13   case.  And turn over -- you could go beyond Schaumburg since

14   you have offered for other law enforcement.

15           But what about law firms?  Search criteria that

16   someone like Meyerkord & Meyerkord can use.

17           MR. MERTES:  I -- as I under- --

18           THE COURT:  Is that something you have?

19           MR. MERTES:  I don't know.

20           MR. SCHORK:  I know that at the depositions this was

21   testified to.  They're called tokens, is the way the witness

22   referred to it.  And what was testified was that the way it

23   works -- the defendant's system works, excuse me -- is that

24   the law firms decide -- sorry, the police departments -- the

25   individual police departments -- decide what's required to

1    pull a traffic accident report which they completed.

2              So, say, you know, the Chicago PD might have one

3    requirement -- I don't even think that they're accessing.  But

4    people who use the iyeTek software can use to -- there are

5    tokens -- certain tokens that they can select from.  And they

6    can choose to open it up to anybody who can search; or, they

7    can require a name and address; or, they can require a date of

8    birth; or, they can require a traffic accident report number.

9              THE COURT:  Does your law firm have tokens in this

10   system or do you rely on iyeTek to provide things to you?

11             MR. SCHORK:  Well, I believe at the -- you know, at

12   the time the report was pulled, I believe the records that

13   they pulled were just searchable.  You could just search.

14   Were open records essentially.  You could search by date or

15   whatnot.

16             THE COURT:  Here is what I want you to do.  I have a

17   criminal matter I have to take up.  Go out in my

18   attorney/witness room.  I want you to narrow these issues and

19   come back in.

20             MR. SCHORK:  Absolutely.  Thank you, your Honor.

21             MR. MERTES:  Thank you, Judge.

22             MR. ZAMPARO:  Thank you.

23      (The Court gave its attention to other matters, after

24   which the following proceedings were had in open court:)

25             THE CLERK:  Recall 15 C 1539, Pavone vs. Meyerkord

1    and Meyerkord.

2            MR. MERTES:  Good morning, again, your Honor.

3            THE COURT:  Good morning, again.

4            MR. ZAMPARO:  Good morning, your Honor.

5            MR. MERTES:  Tyler Mertes for defendants iyeTek and

6    LexisNexis.

7            THE COURT:  The timing worked out well.

8            Good morning.

9            MR. SCHORK:  Erich Schork for Meyerkord & Meyerkord.

10           MR. ZAMPARO:  Roger Zamparo on behalf of the

11   plaintiff.

12           And my apologies, again, your Honor, for speaking

13   over you.

14           THE COURT:  It just makes Joe's job so difficult.

15   You should see one of his transcripts and what they look like

16   when it happens.  I know you are not doing it intentionally,

17   but you should see what it looks like.

18           So, have you made some progress?

19           MR. ZAMPARO:  You asked for a clarification, I think,

20   of what we meant by the input data.  May I respond to that?

21           THE COURT:  Yes.

22           MR. ZAMPARO:  Okay.

23           As we've all agreed, the original way someone could

24   search on the database, on the screen, was by any of the

25   boxes.  For example, I can search by the severity of injury.

1   So, a lawyer could go onto the box -- or the screen -- and

2   say, okay, give me all cases in Illinois yesterday that had a

3   severity injury Category 3, and they can pull all these

4   reports.  Okay?

5            What we're asking for is not the technical stuff.

6   We're asking them for, can you give us specifically what

7   reports were pulled by the firms that could be in our class

8   that use the input data that wasn't a police report number or

9   a client's name?  The assumption being that they are now

10  fishing, and that's the tenet of our case.

11           And Mr. Anwar who invented the software and created

12  it and is now an employee of the defendant's testified:  Yes,

13  I can search that way.

14           And that's what we're asking by input data.  So, my

15  apologies for not being clear earlier.

16           THE COURT:  And have you reached an agreement with

17  respect to production of such information?

18           MR. MERTES:  We haven't.  And if I can --

19           THE COURT:  You have or have not?

20           MR. MERTES:  Have not.  I'm sorry.

21           If I could briefly address that, what the plaintiff

22  is trying to get is to -- that my client was commercially

23  selling these things in contravention of statute.  My client's

24  contracts with the various law firms prohibit that sort of

25  behavior, and, in fact, my client terminates its relationships

1    with law firms when it learns of these things.

2           There were two or three instances that Mr. Anwar

3    testified to where this occurred.  These are in Michigan in

4    2012, and e-mails related to those have been provided to

5    plaintiffs.  And what they demonstrate is that when we learn

6    about this kind of behavior, those contracts are terminated.

7           And, so, what they're seeking is overly broad and not

8    likely to lead to admissible evidence in this instance

9    because --

10          THE COURT:  That is no longer the standard, just so

11   you know.

12          MR. MERTES:  Well -- I'm sorry.

13          THE COURT:  Rule 26 was amended at the --

14          MR. MERTES:  I apologize.

15          THE COURT:  -- beginning of the year.

16          MR. MERTES:  It's not germane to any of the issues in

17   this case.

18          In the instances where that identified -- excuse me,

19   they think reports are being pulled and used for improper

20   purposes, you know, my co-defendant here and in these two

21   instances in Michigan, they have documents relating to those

22   instances.

23          THE COURT:  So, you want the reports that were pulled

24   by all law firms?

25          MR. ZAMPARO:  Using something other than the police

1    report number and/or a client's name.

2         So, yes, we think maybe Mr. Anwar only knew of the

3    three incidents, but there are many other employees.  And if

4    we could find that there were many other reports, I think that

5    fits into exactly the class we're trying to certify.  That

6    they're allowing, negligently or otherwise, people to search

7    these systems and fishing for clients.

8         And we have e-mails from defense counsel that's from

9    various executives now that say, oh, we got to stop that

10   practice.  And now they have much tighter restrictions on what

11   an attorney can pull.  They must put in a name, I believe, and

12   a police number or they're not allowed to even pull it.  So, I

13   think that's extremely relevant to the class.

14        And if they do their search -- which Mr. Anwar said

15   they could do -- and there was nobody else beside Meyerkord

16   and Mancini, so be it.  But we're entitled to find out.

17        MR. MERTES:  I don't know, without reviewing the

18   transcript, whether I agree with his summary of how Mr. Anwar

19   testified and as to the capabilities that this system has to

20   generate a report based on search by a specific criteria.

21        MR. SCHORK:  I'll just -- some of this stuff we

22   disagree with.  The contract between my client and Lexis was

23   terminated based upon the agreement between those two

24   entities.  The terms of the agreement, not -- it had nothing

25   to do with statutory or whatnot violations that were alleged.

 1           And the testimony, as I recall it, was that different

 2    police departments chose which criteria was needed to pull a

 3    report prepared by that department.  So, some departments --

 4    Illinois is an open records state.  Some departments didn't

 5    require any criteria, so it was entirely searchable.  Others

 6    required, for instance, name, address, date of birth, and

 7    police report number.  They could do that.

 8           So, by pulling one report from one jurisdiction that

 9    required nothing -- you know, no tokens, as they call it,

10    which was just, you know, fields to be inserted -- that has

11    nothing to do with the way the report was used.  I just --

12           THE COURT:  This seems really broad.  What you should

13    do is during the relevant time period produce and identify all

14    law firms where you terminated your contract with them for

15    violation of this policy that you have identified; namely,

16    running searches that violated the terms of your policy of

17    what kind of searches they could do.  You said there were

18    three identified already.  If there are more where you

19    terminated for that particular reason, you should identify it.

20           MR. MERTES:  I can do that.  And for the record, your

21    Honor, my understanding is that we have provided all of them.

22    But I can obviously have my client double-check, and if there

23    are --

24           THE COURT:  Double-check.

25           MR. MERTES:  -- additional ones, we'll provide them.

1      THE COURT:  What else in terms of documents that you

2  are seeking that you thought you might have to file a motion

3  to compel over?

4      MR. ZAMPARO:  Again, the documents regarding -- that

5  were sold to Jedediah Wilson and/or Mancini.

6      Again, yes, Lexis is not a defendant under the

7  allegations we made anywhere but in this case, even though

8  Mancini is a different case.  Anybody that was -- that --

9  purchased by him that were sent out under the same

10  circumstances as Mr. Pavone are potential class members.  So,

11  we should be entitled to --

12      THE COURT:  How could they be class members?  How

13  could they be class members here?

14      MR. ZAMPARO:  Because that law firm did the same

15  thing Meyerkord did.  So, the people that were hurt, the

16  people whose reports were pulled, are the class members that

17  -- exactly like Mr. Pavone.

18      THE COURT:  But you do not have other law firms as

19  defendants here.

20      MR. ZAMPARO:  No, but we have the class.  Any law

21  firms.  And Lexis is the defendant, not Meyerkord.  We're not

22  seeking that from Mr. Meyerkord.  We're seeking that from

23  Lexis.

24      So, we think that those documents are relevant

25  because anybody -- for example, Mr. Mancini, or Jedediah

```
 1   Wilson, who has an e-mail they produced to us that he wrote to
 2   them and said he does the same thing he did for Meyerkord for
 3   20 or 30 other law firms.  We don't know of any of that
 4   information.  Those are --
 5           THE COURT:  I still do not understand exactly what it
 6   is you are asking for.
 7           MR. ZAMPARO:  Identification of those specifics
 8   regarding other law firms pulling data, exactly the manner in
 9   which Meyerkord had.  Because all those people are --
10           THE COURT:  We are back to the -- you have not
11   convinced me you are entitled to that.  If you want to file
12   something on that, you can.
13           MR. ZAMPARO:  We can file on that, Judge?
14           THE COURT:  Yes, by Monday.
15           MR. ZAMPARO:  Monday.
16           THE COURT:  You have not convinced me.
17           MR. ZAMPARO:  Okay.
18           THE COURT:  Are there other categories that you
19   discussed?
20           MR. ZAMPARO:  There is one last category, but it
21   appears that both lead counsel on the corporate succession are
22   working on a stipulation.
23           MR. MERTES:  Right.
24           MR. ZAMPARO:  I think they're close to that issue,
25   which then will not be -- will be a non-issue right now.
```

1          THE COURT:  Okay.

2          MR. ZAMPARO:  That's the only one that progress seems

3     to have been made on.

4          THE COURT:  Turn over the documents that I have

5     indicated in one week.

6          MR. MERTES:  Okay.

7          THE COURT:  File any motion to compel after, in good

8     faith, trying to see if you can resolve it, by Monday.

9          MR. ZAMPARO:  This coming Monday?

10         THE COURT:  October 17th.

11         MR. ZAMPARO:  Excuse me, your Honor.  We won't have

12    their response in a week.  We won't --

13         THE COURT:  Well, I directed -- it is something

14    outside of what I have directed them to produce and what I

15    have already ruled on today.  Do not bring back what I have

16    already ruled on today.

17         And, then, come back here next Thursday.

18         MR. ZAMPARO:  I'm going to be in L.A., Judge, on

19    Thursday, back Friday.

20       (Brief pause.)

21         THE COURT:  Can somebody else cover for you from your

22    firm?

23         MR. ZAMPARO:  Both my associates left the firm.  I am

24    a one-person operation, Judge.

25         I leave for L.A. at 1:30 flight on Wednesday.

```
 1                  THE COURT:  Let's do Tuesday morning, then.

 2                  Get your motion to compel on file by noon.

 3                  MR. MERTES:  Your Honor, I'm sorry, I've got a

 4     telephonic status hearing at 9:15 on Tuesday.

 5                  THE COURT:  Where?

 6                  MR. MERTES:  It's telephonic, so I'll be in my office

 7     just across the street.  So, I'm guessing it will take no more

 8     than an hour.

 9                  THE COURT:  All right.  Then come back Tuesday

10     afternoon --

11          (Brief pause.)

12                  THE COURT:  Come back at 1:30.

13                  MR. ZAMPARO:  On Tuesday, the 18th?

14                  THE COURT:  On Tuesday, the 18th.

15                  File your motion to compel by noon on the 17th.

16                  MR. ZAMPARO:  Noon on the 17th, yes, your Honor.

17                  THE COURT:  We will resolve it.

18                  MR. MERTES:  Okay.

19                  Your Honor, there's a few outstanding housekeeping

20     measures, I think one of which is I think there's a current

21     due date for the class certification motion of --

22                  MR. ZAMPARO:  The 17th.

23                  THE COURT:  I will move that, but I am not going to

24     move it until next week when I see what issues --

25                  MR. MERTES:  Okay.
```

1          THE COURT:  You are not going to get 60 days, though.

2     I can tell you that.

3          MR. MERTES:  And one other, then.  Discovery closed.

4     As I understand Rule 56, I would have to file a summary

5     judgment motion by October 31st.

6          THE COURT:  I have not given you a dispositive motion

7     deadline, have I?

8          MR. MERTES:  Just so long -- no, you haven't.  And so

9     long as --

10          THE COURT:  I have not given you one.  I will give

11     you one.

12          MR. MERTES:  Okay.  Thank you, your Honor.

13          MR. SCHORK:  Thank you.

14          MR. ZAMPARO:  Thank you, your Honor.

15          Again, sorry for the confusion.

16                         *    *    *    *    *

17

18     I certify that the foregoing is a correct transcript from the
       record of proceedings in the above-entitled matter.

19

20

       /s/ Joseph Rickhoff                    October 13, 2016
21     Official Court Reporter

22

23

24

25