# EXHIBIT 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

- - -

ANTONIO PAVONE, on Behalf      :
of Himself and All Others      :
Similarly Situated,            :
                               :
        Plaintiffs,            :
                               :
vs.                            :  Case No.
                               :
MEYERKORD & MEYERKORD, LLC,    :  1:15-CV-01539
a Missouri Limited             :
Liability Company,             :
LEXISNEXIS RISK                 :
SOLUTIONS, INC., a             :
Corporation; and IYETEK,       :
LLC a Limited Liability        :
Company,                       :
                               :
        Defendants.            :
                               - - -

        Videoconference deposition of GEOFFREY

MEYERKORD, taken at 711 North 11th Street,

St. Louis, Missouri, on Thursday, July 28, 2016,

beginning at approximately 9:14 a.m., before

Tammie A. Heet, a Registered Professional Reporter,

Certified Shorthand Reporter and Notary Public

within and for the states of Illinois and Missouri.

                    - - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

GEOFFREY MEYERKORD

```
1    advertising of your law firm?
2           A.    No.
3           Q.    Have you ever been the subject of any
4    court sanction in your practice, sir?
5           A.    No.
6           Q.    Has your firm ever been sanctioned by
7    any court in its practice?
8                 MR. SCHORK:  I'll object.  Again,
9    this is well outside the scope of this deposition.
10   I'll instruct that -- I've given you some leeway,
11   but I'll instruct the witness not to answer.
12                MR. SOUMILAS:  Okay.  I think that's
13   improper.  And by the way, that's -- I didn't even
14   -- okay.  Whatever.
15          Q.    (BY MR. SOUMILAS)  Mr. Meyerkord, has
16   any part of your law firm's practice ever involved
17   practicing under the Driver's Privacy Protection
18   Act?
19          A.    No.
20          Q.    I'll refer to the Driver's Privacy
21   Protection Act as the DPPA for short sometimes.
22   And my next question is whether you were at all
23   familiar with the DPPA prior to the Pavone lawsuit
24   brought against your firm.
25          A.    Yes.
```

GEOFFREY MEYERKORD

1          Q.     How were you familiar with that

2    statute?

3          A.     During my due diligence process of

4    investigating the efficacy of an attorney direct

5    mail campaign, I became aware of it.  And I,

6    myself, looked into the statute.

7          Q.     When was that?

8          A.     Late 2013.

9          Q.     And did anybody assist you in that

10   research into the DPPA or was it you alone doing

11   it?

12         A.     Me alone doing it.

13         Q.     Did you keep any written notes or

14   memos of your research into the DPPA in late 2013?

15         A.     No.

16         Q.     Did you keep any type of an

17   electronic record into your research of the DPPA in

18   2013?

19         A.     No.

20         Q.     Do you recall what you determined, if

21   anything, concerning the DPPA after you researched

22   it in 2013?

23         A.     Yes.

24         Q.     And what do you recall in that

25   regard?

**GEOFFREY MEYERKORD**

```
 1              A.    No.
 2              Q.    Did, to your knowledge, your law firm
 3       have any source of obtaining crash reports or
 4       accident reports other than iyeTek?
 5              A.    Yes.
 6              MR. MAO:  Objection.  Sorry.
 7       Objection to the form of the question.
 8              MR. SCHORK:  Yeah, I'll object too.
 9              Q.    (BY MR. SOUMILAS)  What were the
10       other sources that your firm used to obtain
11       accident reports?
12              MR. SCHORK:  I'll object to the form
13       of the question again.  Are you talking -- John,
14       are you talking just generally ever, how have they
15       ever obtained crash reports as a personal injury
16       firm?  I mean, it's a pretty broad -- pretty broad
17       question.
18              MR. SOUMILAS:  No, I'm sorry, I tried
19       to go a little narrower than that.
20              MR. SCHORK:  Yeah.
21              Q.    (BY MR. SOUMILAS)  Other than iyeTek,
22       did you enter into any other type of an agreement
23       or did -- did you have any type of a service where
24       you would regularly purchase accident reports?
25              A.    Yes.
```

GEOFFREY MEYERKORD

| | |
|---|---|
| 1 | THE WITNESS: We obtained the -- |
| 2 | Q. (BY MR. SOUMILAS) Do you understand |
| 3 | that question? |
| 4 | A. I believe I do, sir. We obtained, |
| 5 | from that service, Illinois crash reports. |
| 6 | Q. Okay. And is it your understanding |
| 7 | that the authorized transactions service that's |
| 8 | referenced in Meyerkord 5 is a separate service |
| 9 | than the Docuview service? |
| 10 | A. I don't know. |
| 11 | Q. Did they bill you separately? |
| 12 | A. Yes. |
| 13 | Q. Okay. If you were to please take a |
| 14 | look at Meyerkord 5 at page 6, there's some billing |
| 15 | information in relation to the authorized |
| 16 | transactions service. |
| 17 | A. Yes. |
| 18 | Q. And it is -- I'm sorry, who -- how do |
| 19 | you pronounce the first name of the card holder? |
| 20 | A. Jedediah? |
| 21 | Q. Jedediah D. Wilson. Is that somebody |
| 22 | at your law firm? |
| 23 | A. No. |
| 24 | Q. Who is the cardholder? |
| 25 | A. Jedediah D. Wilson. |

**GEOFFREY MEYERKORD**

1          Q.     Do you know who that person is?

2          A.     Yes.

3          Q.     Who is it?

4          A.     He was our direct mail contractor

5     that assisted in the day-to-day handling of the

6     advertising campaign.

7          Q.     Did he work for your law firm?

8          A.     No.

9          Q.     He was just someone you -- you

10    contracted for advertising services?

11         A.     Yes.

12         Q.     Okay.  And did Mr. Wilson also handle

13    the -- the -- any billing responsibilities related

14    to Docuview?

15         A.     Yes.

16         Q.     Do you know whether Mr. Wilson works

17    for -- for himself or a company?

18         A.     Self-employed.

19         Q.     As far as you know, is the address

20    that we see here at page 6 of Meyerkord 5 his

21    accurate address today?

22         A.     I do not believe it is, sir.

23         Q.     Do you know where he is today?

24         A.     I do not.

25         Q.     Was that a business address or his

GEOFFREY MEYERKORD

1    home address that we see on page 6?

2         A.    I do not know.

3         Q.    Okay.  And with respect to the police

4    departments that you mentioned, where you sometimes

5    acquired accident reports, was that also a service

6    for a fee?

7         A.    We paid for the crash reports, a fee,

8    yes.

9         Q.    So you paid the police departments

10   directly in exchange for the -- a copy of the crash

11   reports?

12        A.    Correct.

13        Q.    Was the Schaumburg Illinois Police

14   Department one of those -- those police departments

15   where you purchased crash reports from directly?

16        A.    Not to my knowledge.

17        Q.    Where were the police departments

18   from which your firm purchased accident reports?

19        A.    I don't recall anymore, the names.

20        Q.    Were they generally in Missouri or

21   all over the country?

22        A.    No, we did not conduct a campaign all

23   over the country.  It would not have been all over

24   the country.

25        Q.    Was your advertisement campaign

GEOFFREY MEYERKORD

```
1    related to car accidents targeted to certain
2    states?
3           A.    Yes.
4           Q.    Which ones, please?
5           A.    Missouri and Illinois.
6           Q.    Are some attorneys at your firm
7    licensed in both of those states?
8           A.    Yes.
9           Q.    And do I take it that the practice
10   for any lawsuits was in state court in either
11   Illinois or Missouri?
12              MR. SCHORK:  Objection.  Form.
13              THE WITNESS:  You want to know
14   whether we practiced -- I'm sorry, go ahead.
15           Q.    (BY MR. SOUMILAS)  Yeah, I want to
16   know whether it was in state court or federal
17   court.
18              MR. SCHORK:  Wait.  Can you clarify
19   the question?  Can you repeat the question again?
20           Q.    (BY MR. SOUMILAS)  Yes.  Was the
21   accident, the car accident litigation practice, in
22   state court or federal court or both?
23           A.    It would have been both.
24           Q.    Okay.  I know you said that
25   Mr. Wilson handled the billing for both Doc- --
```

GEOFFREY MEYERKORD

1    advertisement material like we see attached as
2    Exhibit A to the third amended complaint?
3            A.    Yes.
4            Q.    Okay.  So let's go through that
5    process, please.
6            A.    Yes.
7            Q.    Did your firm, in this timeframe,
8    obtain the crash reports like we see attached here
9    as Exhibit A for Mr. Pavone through iyeTek?
10           A.    Yes.
11           Q.    Do you know the process of how a
12    report like this would have been obtained by your
13   law firm to be used as an enclosure in this type of
14   an advertisement package?
15           A.    Yes.
16           Q.    So please explain how we would go
17   from requesting this type of a crash report to you
18   having it to include with a cover letter in an
19   advertisement package.
20           A.    You want me to explain how we place
21   the items in the mail, how that process worked?
22           Q.    So, no, I'm sorry, let me be a little
23   bit more precise.  So I -- I want to go through the
24   process step by step.  So let's begin with would
25   somebody at your firm or Mr. Wilson access crash

GEOFFREY MEYERKORD

```
1    reports online?

2          A.    Yes.

3          Q.    And who specifically was responsible

4    for accessing crash reports through the iyeTek

5    service?

6          A.    Mr. Wilson.

7          Q.    Do you know where he would do that

8    physically?

9          A.    No.

10         Q.    Did he have any instruction, from

11   your law firm, as to what you were looking for?

12         A.    Yes.

13         Q.    So what -- what were you looking for

14   him to pull?

15         A.    We were looking for cases within a

16   certain parameter of injury code.

17         Q.    So what type of injury code

18   specifically were you looking for?

19         A.    Incapacitating -- these are injury

20   codes assigned by the officer on the street.  And

21   there were three; incapacitating, reported, but not

22   evident, and evident, I believe.

23         Q.    Okay.  And -- and were you looking

24   for crash reports that included all three of these

25   categories of injury?
```

GEOFFREY MEYERKORD

1        A.    Just those three.

2        Q.    Just those three.  So there are

3    additional categories, but your focus was those

4    three that you just identified?

5        A.    That is correct.

6        Q.    And do I understand that, you know,

7    those would be the type of injuries for which your

8    law firm could provide legal services in the

9    ordinary course of your business?

10       A.    Correct.

11       Q.    And were you looking for particular

12   jurisdictions in which those injuries occurred?

13       A.    States in which we were licensed to

14   practice law.

15       Q.    Is that Illinois and Missouri?

16       A.    Correct.

17       Q.    Anyplace else?

18       A.    No.

19       Q.    Were the accident reports limited to

20   particular police departments within those states

21   or could -- could they originate from any police

22   department?

23       A.    The latter, any.

24       Q.    Okay.  And so other than looking for

25   any police department crash report in Missouri or

GEOFFREY MEYERKORD

```
 1    Illinois that had the type of injuries that you
 2    just described in those three categories that you
 3    were looking for, did -- did your firm instruct
 4    Mr. Wilson to tailor his search for crash reports
 5    in any other way?
 6            A.    Yes.
 7            Q.    How else?
 8            A.    Once we obtained the crash report, we
 9    would then only select reports in which we believed
10    cases of liability existed.
11            Q.    And who would make that call?
12            A.    Mr. Wilson.
13            Q.    Okay.  And did you have some criteria
14    to look for in order to -- to make a cut as to
15    whether he thought it was a case where liability
16    existed?
17            A.    Yes.
18            Q.    So just so that the record is clear
19    for both lawyers and nonlawyers, we're talking
20    about type of situations where you felt somebody
21    might be negligent for the accident; is that right?
22            A.    Yes.
23            Q.    Okay.  So if you determined that
24    someone was negligent or at fault, and it was in
25    the states where you practiced and it was the type
```

GEOFFREY MEYERKORD

```
 1      of injury that you were looking for, then you
 2      wanted Mr. Wilson to pull those crash reports,
 3      correct?
 4              MR. SCHORK:  Objection.  Form.
 5              But you can answer.
 6              THE WITNESS:  Close, sir.
 7          Q.   (BY MR. SOUMILAS)  Okay.  Would you
 8      tell me whether there was any other criteria that
 9      you're looking for in order for Mr. Wilson to get
10      you crash reports?
11          A.   I cannot do that --
12          Q.   From iyeTek?
13          A.   I cannot do that, but I can pair down
14      your earlier statement for you.
15          Q.   Well, please do that.
16          A.   One would not know if a case of
17      liability existed until the report was purchased,
18      so --
19          Q.   Okay.
20          A.   -- so once the report was -- once the
21      report was purchased, then and only then, could one
22      read the report and make the liability
23      determination.
24          Q.   Okay.  So -- so that's an important
25      point.  So in terms of pulling the report from
```

GEOFFREY MEYERKORD

1      iyeTek online, you will -- your firm was looking

2      for three type of injury codes and accidents that

3      happened in Illinois and Missouri only; is that

4      correct?

5              A.    Correct.

6              Q.    Okay.  And once those reports -- so

7      let's -- let's just actually stop at that first

8      step for a moment longer.  Were you looking for

9      accidents that happened a week ago, a month ago, at

10     any time?  Did the timing matter to you?

11             A.    In which jurisdiction?

12             Q.    In either Illinois or Missouri.

13             A.    Yes, the timing did matter.

14             Q.    What was the instruction that your

15     law firm gave to your contractor in terms of the

16     timing for when to pull crash reports from iyeTek?

17             A.    One could pull crash reports as soon

18     as they became available, but one could not place

19     the crash report with the advertising material in

20     the United States mail in the state of Missouri

21     until the 30th day.

22             Q.    The 30th day after the accident?

23             A.    Correct.

24             Q.    Okay.  Was it your general practice

25     to pull crash reports from the state of Illinois as

GEOFFREY MEYERKORD

```
1       soon as they became available after the accident?
2            A.    Yes.
3            Q.    And was it your firm's practice to
4       pull crash reports from the state of Missouri as
5       soon as they came -- became available after the
6       accident?
7                  MR. SCHORK:  I'm going to object to
8       this line of questioning with respect to Missouri
9       because that has nothing do with this case and it's
10      clearly outside of the scope of the 30(b)(6)
11      notice.  Instruct the witness not to answer.
12                 MR. SOUMILAS:  Okay.  So it's -- that
13      is a wholly inappropriate objection.
14                 MR. SCHORK:  Which topic do you think
15      that this is responsive to, John?
16                 MR. SOUMILAS:  9.
17                 MR. SCHORK:  Topic 9 references the
18      amendment to the plaintiff's complaint, which is an
19      Illinois -- includes an Illinois traffic crash
20      report.  It's -- it's absolutely not responsive to
21      that topic.
22                 MR. SOUMILAS:  So I think it's not
23      limited to that type of Illinois crash report, and
24      I think your witness already opened the door
25      concerning the practice in Missouri.
```

GEOFFREY MEYERKORD

1          MR. SCHORK:  I don't think this is an

2     open the door issue.  I gave you some leeway and I

3     mean, it's -- it's clearly outside the scope of the

4     30(b)(6) notice that was served.  I mean, if you

5     focus your questioning on --

6          MR. SOUMILAS:  You're instructing

7     him --

8          MR. SCHORK:  -- Illinois and the

9     notice that you've served and which we've tendered

10    the witness to talk about the, what, 12 topics -- I

11    mean, or 11 topics, excuse me, I think -- so I

12    mean, I'm -- I'm going to stand on that objection.

13    It just -- it has nothing to do with this case.

14         MR. SOUMILAS:  Okay.  Okay.  You --

15    you're instructing this witness not to answer?

16         MR. SCHORK:  Yes.

17         MR. SOUMILAS:  Okay.

18         Q.    (BY MR. SOUMILAS)  Okay.

19    Mr. Meyerkord, focusing on Illinois crash reports,

20    do I understand that your firm's practice was to

21    purchase those crash reports from iyeTek as soon as

22    they were available after the accident?

23         A.    Yes.

24         Q.    And again, you looked for those three

25    type of injury codes that you testified about

GEOFFREY MEYERKORD

1      earlier, correct?

2              A.      Correct.

3              Q.      And in Illinois, is it my

4      understanding that your firm's practice was to send

5      the advertisement material to the accident victims

6      in Illinois right away, without delay?

7              A.      Correct.

8                      MR. MAO:  Objection to the form of

9      the question.

10             Q.      (BY MR. SOUMILAS)  Okay.  So there

11     was no, you know, waiting for 30 days before the

12     advertisement was mailed to consumers in Illinois,

13     correct?

14             A.      Correct.

15             Q.      Was your firm's procedure to get the

16     advertisement material in the mail to those

17     Illinois car accident victims for whom you -- you

18     procured the crash reports within a day of

19     procuring those crash reports?

20             A.      Was it my -- pardon me, I didn't hear

21     the first part, sir.

22             Q.      Was it your firm's practice to -- to

23     get those advertisement letters out within a day of

24     purchasing Illinois crash reports?

25             A.      If possible.

GEOFFREY MEYERKORD

```
 1              Q.    So it's incapacitating and evident?
 2              A.    Yes, sir, I believe so.
 3              Q.    Okay.  So other have -- other than
 4       clicking on to the appropriate code for
 5       incapacitating, and then the appropriate code for
 6       evident, did you need to enter any type of data
 7       into the iyeTek website before you were able to
 8       procure crash reports in Illinois?
 9              A.    Yes.
10              MR. MAO:  Objection to the form of
11       the question again, please.  Sorry.
12              Q.    (BY MR. SOUMILAS)  All right.  Other
13       than the injury codes, what other type of
14       information did you need to make as part of your
15       request of iyeTek in order to obtain crash reports
16       in Illinois?
17              A.    I do not recall.
18              Q.    Okay.  Is it correct that at the time
19       that your firm would be procuring these crash
20       reports, you did not have the names of the car
21       accident victims?
22              A.    Correct.
23              Q.    Is it also correct that at the time
24       that you first procured the crash reports, that you
25       would not have the address of the car accident
```

GEOFFREY MEYERKORD

```
 1                    THE WITNESS:  I believe I know -- I
 2      believe --
 3                    MR. SOUMILAS:  Well, you can't do it
 4      in the middle --
 5                    THE WITNESS:  I believe I know the
 6      answer, and I can give you the answer with a
 7      caveat.
 8           Q.    (BY MR. SOUMILAS)  Okay.  Then would
 9      you please answer my question, Mr. Meyerkord.
10           A.    Yes.  That would have been the
11      procedure with this caveat.  At some point during
12      the Illinois attorney direct mail campaign,
13      remember we dropped out that third category.  And
14      it may very well be that Mr. Pavone's injury code
15      was that third category, which we later removed
16      from the campaign.
17           Q.    Okay.  Other than that caveat, or
18      whether it was a -- you were looking at two
19      categories of injuries or three, was the rest of
20      the prac- -- the practice used in the case of
21      Mr. Pavone the standard one?
22           A.    Yes.
23           Q.    All right.  And -- and then do I
24      understand this to have been the practice from
25      approximately the time that you signed the
```

GEOFFREY MEYERKORD

1           A.      I don't recall.
2           Q.      To your knowledge, when you received
3      the application for iyeTek reports, was it already
4      typed out or did you fill it in yourself?
5           A.      I don't recall.
6           Q.      Okay.  To your knowledge, after
7      entering into this agreement with iyeTek, did
8      anybody at iyeTek ask you the specific reason why
9      your law firm would be obtaining the crash reports
10     from Illinois?
11          A.      Not to my knowledge.
12          Q.      Okay.  Did you or anyone on your
13     behalf ever specifically advise iyeTek you would be
14     obtaining the crash reports, so that you could send
15     advertisement material to people who might be
16     interested in your legal services?
17          A.      I don't recall that.
18          Q.      Am I correct that that was the -- the
19     purpose for which your firm purchased crash
20     reports, in order specifically to send
21     advertisement material for legal services?
22          A.      Yes.
23          Q.      And there was no other pur- --
24     purpose for your firm purchasing Illinois crash
25     reports; is that correct?

GEOFFREY MEYERKORD

1          A.      Incorrect.

2          Q.      Okay.  What other purposes, other

3    than advertising, did your firm have for the crash

4    reports?

5          A.      If we had a client for which we

6    needed to acquire a crash report that we all

7    otherwise didn't have, we could have acquired it

8    through this portal.

9          Q.      And did you, in fact, use the iyeTek

10   portal to obtain crash reports for existing clients

11   who you already represented?

12         A.      I believe so.

13         Q.      And for those clients, would you have

14   their name and address already?

15         A.      Would I have it here today?

16         Q.      No, at the time that you -- at the

17   time that you would purchase a crash report for an

18   existing client --

19         A.      Yes.

20         Q.      -- would you have that client's name

21   and address?

22         A.      Yes.

23         Q.      And am I correct that if you have an

24   existing client whose name and address you know,

25   that you would use that information in the portal

GEOFFREY MEYERKORD

1    in order to find the correct crash report?

2         A.    Yes.

3         Q.    So you wouldn't just simply type in

4    some injury code, because you could get probably

5    thousands of hits, correct?

6              MR. SCHORK:  Objection, form,

7    hypothet- -- I mean --

8              THE WITNESS:  You would get multiple.

9         Q.    (BY MR. SOUMILAS)  But if you were

10   looking for a particular client whose accident

11   happened on a particular date and you had that

12   information, you would enter it into the portal,

13   correct?

14        A.    By name.

15        Q.    Right.  For the crash reports which

16   were accompanied -- excuse me, which accompanied --

17   accompanied the advertisement material that we see

18   as Exhibit A to the Pavone complaints, for those

19   people, you did not have the names and addresses at

20   the time you accessed the iyeTek portal to look for

21   crash reports --

22        A.    Correct.

23        Q.    -- is that correct?

24              Okay.  Do you know specifically, sir,

25   where iyeTek was obtaining any of the information

**GEOFFREY MEYERKORD**

1                          NOTARIAL CERTIFICATE

2

3              I, Tammie A. Heet, Registered Professional

4      Reporter, certified Shorthand Reporter for the

5      State of Illinois, and Certified Court Reporter for

6      the state of Missouri and a duly commissioned

7      Notary Public within and for the States of Missouri

8      and Illinois, do hereby certify that the witness

9      whose testimony appears in the foregoing deposition

10     was duly sworn by me; that the testimony of said

11     witness was taken by me to the best of my ability

12     and thereafter reduced to typewriting under my

13     direction; that I am neither counsel for, related

14     to, nor employed by any of the parties to the

15     action in which this deposition was taken, and

16     further that I am not a relative or employee of any

17     attorney or counsel employed by the parties

18     thereto, nor financially or otherwise interested in

19     the outcome of the action.

20

21

22              _____

23              Tammie A. Heet, RPR, CSR, CCR

24

25