# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANTONIO PAVONE, | |
| Plaintiff, | |
| v. | Case No. 1:15-CV-01539 |
| MEYERKORD & MEYERKORD, LLC, LEXISNEXIS RISK SOLUTIONS INC., and IYETEK, LLC, | Honorable Amy J. St. Eve |
| Defendants. | |

## DEFENDANTS LEXISNEXIS RISK SOLUTIONS INC. AND IYETEK, LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTS ................................................................................................................... 3

I.      IyeTek Is One of a Number of Providers of Electronic Crash Reporting Services ........................................................................................ 3

II.     Plaintiff and His Family Were Involved in a Car Accident for Which an Accident Report Was Generated and Was Eventually Made Available for Purchase on an eCommerce Web Portal .............................................. 4

III.    Plaintiff's Accident Report Was Subsequently Purchased ...................... 5

IV.    Plaintiff Alleges That He Has Suffered Actual Damages......................... 6

LEGAL STANDARDS .......................................................................................... 6

ARGUMENT ......................................................................................................... 7

I.      Plaintiff's Proposed Class Cannot Be Certified Because the Class Definition Bears No Relation to Plaintiff's DPPA Claim and Is Overly Broad ......................................................................................................... 8

       A.     Plaintiff's Class Definition Fails to Track the Elements of His DPPA Claim........................................................................... 9

             i.     "Crash Reports" Are Not "Personal Information from Motor Vehicle Records" ..................................... 10

             ii.    The Name, Address, and Report Number Criteria Do Not Supplant the Requirement for an Impermissible Use ................. 12

             iii.   The 24-Hour Time Limitation Is Arbitrary and Irrelevant and Has No Relation to a Solicitation Use................................. 13

             iv.   Plaintiff's Class Definition Is Overly Broad and Includes Individuals Who Cannot State Any Claim under the DPPA ....... 14

       B.     The Defects in Plaintiff's Class Definition Cannot Be Cured Because No Class Is Identifiable ............................................... 15

II.     Plaintiff Failed to Meet the Requirements of Rule 23(a).................... 17

       A.     There Are No Common Answers to the Central Questions of Liability in This Case ........................................................... 17

             i.     IyeTek's Knowledge as to Each Class Member Is an Individualized Inquiry.................................................. 19

             ii.    Whether the Crash Reports Contained "Personal Information from a Motor Vehicle Record" Is an Individualized Inquiry.................................................. 21

iii.    The Permissibility of Each Law Firm's Use of the Information Disclosed Is an Individualized Inquiry ................... 24

B.    Plaintiff's Class Also Fails to Satisfy the Typicality Requirement ......... 26

C.    Plaintiff Also Cannot Satisfy the Superiority Prong of Rule 23 .............. 28

III.    The Requested Relief Is Improper and Moot ...................................................... 29

CONCLUSION ........................................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*CE Design Ltd. v. Cy's Crabhouse North, Inc.*,
259 F.R.D. 135 (N.D. Ill. 2009)..............................................................................7

*Chatman v. Sears, Roebuck & Co.*,
MDL-1703, 2009 U.S. Dist. LEXIS 97594 (N.D. Ill. Oct. 20, 2009) ....................9, 13, 14, 15

*Clay v. Am. Tobacco Co.*,
188 F.R.D. 483 (S.D. Ill. 1999) .......................................................................29, 30

*Comcast Corp v. Behrend*,
133 S. Ct. 1426 (2013)................................................................................ passim

*Dahlstrom v. Sun-Times Media, LLC*,
2016 U.S. Dist. LEXIS 134227 (N.D. Ill. Sept. 29, 2016) ....................................10

*Duffin v. Exelon Corp.*,
2007 WL 845336 (N.D. Ill. Mar. 19, 2007)...........................................................14

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ...............................................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)..............................................................................................18

*Figueroa v. Taylor*,
2006 WL 3022966 (S.D.N.Y. Oct. 23, 2006) .......................................................11

*General Telephone Company of Southwest v. Falcon*,
457 U.S. 147 (1982)........................................................................................6, 7, 26

*Groussman v. Motorola, Inc.*,
2011 WL 5554030 (N.D. Ill. Nov. 15, 2011) ..........................................................9

*In re Constar Int'l Sec. Litig.*,
585 F.3d 774 (3d Cir. 2009)....................................................................................6

*Jacobs v. Osmose, Inc.*,
213 F.R.D. 607 (S.D. Fla. 2003)...........................................................................19

*Jamie S. v. Milwaukee Pub. Sch.*,
668 F.3d 481 (7th Cir. 2012) .........................................................................15, 25

*Khalif L. v. City of Union City*,
2012 U.S. Dist. LEXIS 64567 (N.D. Cal. May 8, 2012) ........................................8

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
 571 F.3d 672 (7th Cir. 2009) ........................................................................8, 14

*Lindh v. Dir. Fed. Bureau of Prisons*
 No. 2015 WL 179793 (S.D. Ind. Jan. 14, 2015) ..........................................14

*Messner v. Northsore Univ. HealthSystem*,
 669 F.3d 802 (7th Cir. 2012) ...................................................................18, 26

*Mullins v. Direct Digital, LLC*,
 795 F.3d 654 (7th Cir. 2015) .....................................................................8, 28

*N.B. v. Hamos*,
 26 F. Supp. 3d 756 (N.D. Ill. 2014) ..............................................................8

*Oshana v. Coca-Cola Co.*,
 472 F.3d 506 (7th Cir. 2006) ...................................................................14, 26

*Panwar v. Access Therapies, Inc.*,
 2015 WL 329013 (S.D. Ind. Jan. 22, 2015)...................................................8

*Parkis v. Arrow Fin. Servs., LLC*,
 2008 WL 94798 (N.D. Ill. Jan. 8, 2008) ......................................................18

*Parus v. Kroeplin*,
 2006 WL 278374 (W.D. Wis. Jan. 31, 2006) ...............................................27

*Pavone v. Law Offices of Anthony Mancini, Ltd.*,
 2016 WL 4678311 (N.D. Ill. Sept. 7, 2016) ................................................16

*Pavone v. The Law Offices of Anthony Mancini, Ltd.*,
 No. 15-cv-1538 (N.D. Ill.) ........................................................................5, 13

*Pavone v. Meyerkord & Meyerkord, LLC*,
 118 F. Supp. 3d 1046 (N.D. Ill. 2015) .........................................................12

*Potocnik v. Carlson*,
 2016 WL 3919950 (D. Minn. July 15, 2016) ...............................................27

*Radmanovich v. Combined Ins. Co. of Am.*,
 216 F.R.D. 424 (N.D. Ill. 2003) ...................................................................28

*Reno v. Condon*,
 528 U.S. 141 (2000)........................................................................................10

*Retired Chicago Police Ass'n v. City of Chicago*,
 7 F. 3d 584 (7th Cir. 1993) ...........................................................................26

*Rodriquez v. Ford Motor Credit Co.*,
  2002 WL 655679 (N.D. Ill. Apr. 19, 2002) ...............................................................8

*Savanna Group, Inc. v. Trynex, Inc.*,
  2013 WL 66181 (N.D. Ill. Jan. 4, 2013) ...................................................................7

*Siegler v. Best Buy Co. of Minn.*,
  519 Fed. App'x 604 (11th Cir. 2013) .....................................................................10

*Soutter v. Equifax Info. Servs., LLC*,
  498 F. App'x 260 (4th Cir. 2012) ......................................................................27, 28

*Thomas v. George, Hartz, Lundeen, Fulmer*,
  525 F.3d 1107 (11th Cir. 2008) ...............................................................................9

*Wal-Mart Stores v. Dukes*,
  564 U.S. 338 (2011)......................................................................................6, 7, 17, 18

*Wilkins v. Just Energy Grp., Inc.*,
  308 F.R.D. 170 (N.D. Ill. 2015)..............................................................................18

**STATUTES**

625 ILCS 5/11-416 ...................................................................................................21

18 U.S.C. § 2721 ................................................................................................ passim

18 U.S.C. § 2722 .........................................................................................................9

18 U.S.C. § 2724(b) ............................................................................................27, 28

18 U.S.C. § 2725(3) ....................................................................................................1

Fla. Stat. § 316.066(f)(2)(a) .....................................................................................21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .............................................................................................. passim

NEWBERG ON CLASS ACTIONS § 3:2, at 158 (5th ed. 2011) .........................................8

Defendants, LexisNexis Risk Solutions Inc. ("LNRS")[1] and iyeTek, LLC ("iyeTek"), (collectively, the "Defendants"), submit this Memorandum in Opposition to Plaintiff's Motion for Class Certification (hereinafter, "Plaintiff's Motion") (Dkt. No. 123).

## INTRODUCTION

Plaintiff, Antonio Pavone ("Plaintiff"), brings the instant putative class action complaint alleging that Defendants violated the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et seq.* ("DPPA"), by providing accident reports to law firms who then purportedly used such reports to impermissibly solicit the persons identified therein as legal clients. In this regard, Plaintiff's Motion seeks to certify a class of all U.S. residents about whom an accident report was generated and subsequently disclosed by iyeTek to a law firm within 24 hours of the report becoming available for purchase, and which was not obtained via a search using the reported subject's name and address or report number.

This class definition, however, is fatally defective. To establish a DPPA violation, Plaintiff must prove that Defendants disclosed personal information,[2] "from a motor vehicle record," knowing that the record would be used for a purpose not permitted under the Act. Plaintiff's class definition does not track these elements, but rather uses a series of flawed assumptions which are clearly intended to mask the fact that this type of DPPA liability necessarily turns on individualized issues and inquiries. Indeed, Plaintiff's class definition is

---

[1] The parties stipulated that LexisNexis Claims Solutions Inc., not LNRS, is the proper defendant in this matter. (Dkt. No. 118; *see also* Pl.'s Mot. for Class Cert. at 1 n.1.) However, Plaintiff has failed to dismiss LNRS. Because LNRS has no involvement in this matter, Plaintiff's motion for certification is presumably directed at iyeTek only.

[2] For the reasons stated in their motion to dismiss, iyeTek continues to dispute that information on "accident reports" constitutes "personal information" as defined under the DPPA. *See* Dkt. No. 69 at 11–19; *see also* 18 U.S.C. § 2725(3) (excluding "information on vehicular accidents" from the definition of personal information).

1

completely incongruent to his own allegations and arguments in an apparent "bait-and-switch."

Moreover, Plaintiff's proposed class is grossly overbroad and includes several groups of individuals who have no possible DPPA claim under any circumstances. Even if the class definition properly tracked the elements of a DPPA claim, it would be impossible to ascertain possible class members ████████████████████████████████████████ ████████████████████████████████████████████████████████ or when a law firm used the information for a solicitation purpose. Thus, the defects in Plaintiff's class definition are incurable and Plaintiff's Motion should be denied with prejudice on this basis alone.

Notwithstanding the above, Plaintiff also failed to meet the other demanding requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Plaintiff failed to prove commonality, typicality, predominance and superiority of his claims. As the responding officer to the car accident in this case testified, "[e]very situation is dynamic" and "no 2 crashes, as similar as they may be, are going to be exactly the same." Such is the case with Plaintiff's DPPA claim where every element requires an individualized inquiry and analysis such that no trial or relief can be granted on a class-wide basis. To be sure, when the central question of liability must be resolved through individualized proof, the Court cannot certify a class.

Finally, no class can be certified under Rule 23(b)(2) as Plaintiff's primary demand for relief is monetary, not injunctive. Even so, the demanded injunctive relief is and always was moot, as iyeTek's policies already prohibited the use of the information it provides for commercial solicitation. Plaintiff's lawsuit was completely unnecessary.

In light of the above, Defendants respectfully request that the Court deny Plaintiff's Motion and deny certification of the proposed class.

## FACTS

### I.    IyeTek Is One of a Number of Providers of Electronic Crash Reporting Services.

The creation of accident reports by law enforcement personnel vary greatly (1) from state to state, (2) among individual law enforcement agencies ("LEAs") within a state and (3) even among individual officers within a specific LEA.  (S. Anwar Decl. ¶ 3.)  For example, some officers may ask the involved parties to copy down their information onto a sheet of paper.  (*See id*. at ¶ 4.)  Other jurisdictions may ask the involved parties to input the information onto a web site sometime after the accident occurred.  (*See id*.)  Other officers may take the license of the vehicle drivers and handwrite a report or use that same information to type the available information onto a computer terminal.  (*See id*.)  In even other scenarios,  certain law enforcement agencies ("LEAs") use electronic crash reporting technology supplied by third party vendors, such as the one used by the Schaumburg PD.  (*See id*.)

IyeTek, by and through its electronic crash reporting system, "iyeCrash", and its related eCommerce web portal, authorizetransaction.com, is one of a number of marketplace options available to LEAs for providing public access to vehicle accident reports.  (*See id*. at ¶ 7; Ex. A, S. Anwar Dep. Tr. at 22:13–23:5.)

The iyeCrash software is only available in 14 states, and not all LEAs within those states use the software.  (S. Anwar Decl. ¶ 13.)  Even when available, the use of the different iyeCrash functionalities may differ among agencies and individual accident scenes because, among other

reasons:

- Officers may prefer to manually prepare accident reports;

- The iyeCrash software is not functioning properly at the scene of an accident;

- ██████████████████████████████████████████████

- The involved party verbally provides his or her information to the officer.

████████████████████████████████████████████████████████

## II.  **Plaintiff and His Family Were Involved in a Car Accident for Which an Accident Report Was Generated and Was Eventually Made Available for Purchase on an eCommerce Web Portal.**

On January 15, 2015, Plaintiff and his wife, Karen Pavone, along with their one and a half year old son, were involved in a car accident in Schaumburg, Illinois.  (Ex. C; Ex. D, K. Pavone Dep. Tr. 11:1–5.)  Officer Alan Takei of the Schaumburg Police Department ("Schaumburg PD") responded to the accident.  (TAC ¶ 12; Ex. C.)  Plaintiff allegedly provided his driver's license and insurance card to the officer.  (Ex. E, Pl.'s Dep. Tr. 10:1–5.)  However, Karen Pavone did not have a driver's license.  (Ex. D, K. Pavone Dep. Tr., 11:6–18.)  Plaintiff's son likewise did not have any identification because of his age.  (*Id*. at 11:1–5, 26:21–24.)  Accordingly, Plaintiff verbally provided both his wife's and son's names, dates of birth, addresses and telephone numbers to the officer.  (Ex. E, Pl.'s Dep. Tr. 10:14–17, 17:17–18:11.)

Officer Takei then created an accident report based on the information he collected.  As Officer Takei stated during his deposition, he cannot remember nor determine from looking at the report whether ████████████████████████████████████████████  (Ex. B, A. Takei Dep. Tr. 40:3–8.) ████████████

4

 the Schaumburg PD subsequently sent Plaintiff's accident report to iyeTek to make it available on iyeTek's eCommerce web portal.  (*See* TAC ¶ 16.)

**III.**    **Plaintiff's Accident Report Was Subsequently Purchased.**

On January 16, 2015, Defendant Meyerkord, a law firm, purchased a copy of Plaintiff's accident report and allegedly sent him advertising materials. (Ex. F; TAC ¶ 29, Ex. A.)  Another law firm, The Mancini Law Firm ("Mancini"), also purchased a copy of Plaintiff's accident report on January 20, 2015 and allegedly sent Plaintiff advertising materials the following day. (Ex. F; *see also Pavone v. The Law Offices of Anthony Mancini, Ltd.*, No. 15-cv-1538 (N.D. Ill.) [hereinafter, the "*Mancini* Case"], Dkt. No. 5-1.)

**IV.** **Plaintiff Alleges That He Has Suffered Actual Damages.**

Plaintiff claims he suffered emotional distress, anxiety, loss of privacy, and fear for the safety of his wife and infant son as a result of Defendants' actions. (TAC ¶ 40; *see also* Pl.'s Mot. at 11.) During his deposition, Plaintiff was asked to describe his claimed "emotional distress," to which he responded: "I felt that my privacy and my son's and my wife's information was used without my permission, without permission. Any my son is a minor. I don't know [sic] want my son's information being out there." (Ex. E, Pl.'s Dep. Tr. 35:18–24.) Plaintiff further expounded on the alleged invasion of privacy by stating, "You obtained my information, used it without my permission. My information is private to me. My son's information is private to me. My wife's information is private to us. I didn't give it to you." (*Id.* at 36:10–14.) Plaintiff claimed that he feared for the safety of his minor child as "his information, I guess, is obtainable by anybody." (*Id.* at 36:16–21.) Plaintiff now seeks $2,500 on behalf of himself and each of the putative class members, including his wife and son. (TAC ¶ 50–52; *see also* Pl.'s Mot. at 4, 17.)

## LEGAL STANDARDS

For any class action, certification is "an especially serious decision" with enormous consequences. *In re Constar Int'l Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009). A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348 (2011). In *General Telephone Company of Southwest v. Falcon*, 457 U.S. 147, 161 (1982), the Supreme Court articulated two principles of Rule 23 analysis that necessarily flow from the exceptional nature of

the class action device: (1) "actual, not presumed" compliance with Rule 23 is "indispensable," and (2) a trial court must conduct a "rigorous analysis" of Rule 23's prerequisites before taking the extraordinary measure of certifying a class. *Id.* at 160, 161; *see also Savanna Group, Inc. v. Trynex, Inc.*, 2013 WL 66181, at *1 (N.D. Ill. Jan. 4, 2013).

Courts have stressed that it is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but rather it is the plaintiff who bears the burden of showing that the class does comply with Rule 23. *See, e.g., CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135, 140 (N.D. Ill. 2009). Specifically, "[t]o be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – and one subsection of Rule 23(b)." *Trynex, Inc.*, 2013 WL 66181, at *2; Fed. R. Civ. P. 23. The plaintiff must offer "evidentiary proof" that "affirmatively demonstrate[s]" the requirements of Rule 23 are satisfied. *Comcast Corp v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *see also Dukes*, 564 U.S. at 350 (a plaintiff "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."). "Failure to meet any of the Rule's requirements precludes class certification." *Trynex, Inc.*, 2013 WL 66181, at *2.

## ARGUMENT

Plaintiff's Motion seeks to certify one class against Defendant iyeTek:

All persons residing within the United States and its Territories about whom, within four years prior to the filing of this action and extending through the resolution of this action, Defendant [iyeTek] sold a crash report to a law firm within 24 hours of the time the report became available for purchase on Defendant's e-commerce web-portal, but excluded from the class are the subjects of those reports obtained by any law firm using the name and address of the subject or the subject's accident report number. (Pl.'s Mot. at 3–4.)

This proposed class is fatally defective because (1) the class definition fails to track the

elements of a DPPA claim and (2) adjudication of the class and claim at issue is predicated on individual inquiries that cannot be resolved on a class basis. Each of these issues absolutely precludes class certification. Accordingly, Plaintiff's Motion must be denied.

I.     **Plaintiff's Proposed Class Cannot Be Certified Because the Class Definition Bears No Relation to Plaintiff's DPPA Claim and Is Overly Broad.**

"Courts . . . must be able to know who belongs to a class before they can determine the numerosity of the class, the commonality of the claims of the class members, or any of the other class certification prerequisites." NEWBERG ON CLASS ACTIONS § 3:2, at 158 (5th ed. 2011). Thus, as a preliminary matter, the Court must determine "the adequacy of the class definition itself." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

Failure to define a class "in which membership is properly related to the merits of plaintiff's claims" is "fatal." *Khalif L. v. City of Union City*, 2012 U.S. Dist. LEXIS 64567, at *18 (N.D. Cal. May 8, 2012). In other words, "'a proper class definition cannot be so untethered from the elements of the underlying cause of action that it wildly overstates the number of parties that could possibly demonstrate injury.'" *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009); *see Panwar v. Access Therapies, Inc.*, 2015 WL 329013, at *3 (S.D. Ind. Jan. 22, 2015) (holding that the class definition is not ascertainable because it "bears little connection to the claims in th[e] case"). A court must therefore "take into consideration the substantive elements of the plaintiff's cause of action, inquire into the proof necessary for the various elements, and envision the form that trial on the issues would undertake." *Panwar*, 2015 WL 329013, at *2; *see also Rodriquez v. Ford Motor Credit Co.*, 2002 WL 655679, at *1 (N.D. Ill. Apr. 19, 2002) ("The court must understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of certification issues."); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 763 (N.D. Ill. 2014) (class certification should be denied if class

8

members are impossible to identify without mini-trials).

Where a proposed class definition is disconnected from the elements of the underlying claim, the Court must deny class certification. *Chatman v. Sears, Roebuck & Co.*, MDL-1703, 2009 U.S. Dist. LEXIS 97594, at *15 (N.D. Ill. Oct. 20, 2009) (denying class certification and finding proposed class to be overbroad and disconnected from the underlying claim); *see also Groussman v. Motorola, Inc.*, 2011 WL 5554030, at *7 (N.D. Ill. Nov. 15, 2011) ("[T]he failure of Plaintiffs to delineate an appropriate class is another basis to deny the instant motion for class certification."). Here, as in the *Chatman* case, even a basic review of Plaintiff's proposed class definition reveals that it is completely disconnected from the elements of the underlying DPPA claim and is overly broad and inclusive of individuals who have no possible claim for relief under the DPPA. Moreover, even if the class definition were properly stated in accordance with the elements of a DPPA claim, the inquiries involved necessarily make the class members unidentifiable. Thus, the defects in Plaintiff's class definition are incurable and Plaintiff's Motion should be denied with prejudice on this basis alone.

### A. **Plaintiff's Class Definition Fails to Track the Elements of His DPPA Claim.**

To state a claim under the DPPA, a plaintiff must establish that the defendant (1) knowingly (2) obtained or disclosed personal information from a motor vehicle record (3) for a use not permitted under Section 2721(b) of the statute. 18 U.S.C. § 2722(a); *see Thomas v. George, Hartz, Lundeen, Fulmer*, 525 F.3d 1107, 1112 (11th Cir. 2008) ("[W]e conclude that the DPPA is silent on which party carries the burden of proof and, as such, the burden is properly upon the plaintiff."). Plaintiff's proposed class definition ignores all of these elements in a transparent attempt to hide the fact that this type of DPPA liability necessarily turns on individualized issues and inquiries. Indeed, Plaintiff's class parameters are wholly irrelevant and

unconnected to his own allegations and arguments.

Plaintiff claims that iyeTek allegedly violated the DPPA by knowing that accident reports furnished to law firms were used for advertising to solicit new clients – a purportedly impermissible use under the DPPA. (*See, e.g.,* Pl.'s Mot. at 1; TAC ¶ 51). However, the proposed class definition makes no reference to (1) any "knowing" disclosure by iyeTek, (2) any individual's protected personal information, or (3) any impermissible use of such information.

Instead, Plaintiff's class definition makes several assumptions based on the *circumstances* of procuring a crash report unsupported by facts or even common sense. Specifically, Plaintiff's class is comprised of individuals (1) about whom a "crash report" was obtained (2) within 24 hours of such report being made available for purchase, and (3) which was requested without searching on the individuals' names and addresses or accident report numbers. <u>None</u> of these criteria stated in Plaintiff's class definition are an element of a DPPA claim, nor do they bear any relation to or effectively supplant any of the requirements of a DPPA claim.

i.   <u>"Crash Reports" Are Not "Personal Information from Motor Vehicle Records."</u>

Plaintiff's class definition employs the term "crash reports" as a proxy for "personal information from a motor vehicle record." However, the proxy does not work and fails to satisfy the requirements for class certification.

It is well-established that the DPPA only protects "personal information" obtained from a state DMV.[4] *Reno v. Condon*, 528 U.S. 141, 146 (2000) ("[t]he Act also regulates the resale and rediscloure of drivers' personal information by private persons who have obtained the information *from a state DMV*") (emphasis added); *Siegler v. Best Buy Co. of Minn.,* 519 Fed.

---

[4] The DMV in Illinois is the Illinois Secretary of State ("SOS").  *See Dahlstrom v. Sun-Times Media, LLC*, 2016 U.S. Dist. LEXIS 134227, at *7 (N.D. Ill. Sept. 29, 2016).

App'x 604, 605 (11th Cir. 2013) ("[a] plain reading of the DPPA makes clear that the Act was intended to prohibit only the disclosure or redisclosure of information <u>originating</u> from state department of motor vehicles ('DMV') records").  In other words, "the plaintiff must show that the defendants caused a DMV search to be made."  *Figueroa v. Taylor*, 2006 WL 3022966, at *4 (S.D.N.Y. Oct. 23, 2006).

"Crash reports," by their very nature, are not equivalent to "personal information from a motor vehicle record."  Indeed, crash reports are not generally created by the DMV, but rather by the police officers called to the scene of an accident.  The police officers can obtain information for each field on an accident report from a variety of sources.  For instance, the information that is input into a "crash report" may be derived or procured directly from the individuals who were involved in the accident.  This is especially true where the subjects of an accident do not even have DMV records (e.g., minor children, elderly drivers without a license).  Or, the information may be obtained from involved parties after the accident, if for example, an involved party voluntarily calls the LEA to modify certain information on an accident report.  (*See* Ex. A, S. Anwar Dep. Tr. 53:14–23) (explaining why address information on a report may be modified post-accident).

Plaintiff's case exemplifies the fact that information on an accident report is not necessarily derived from the DMV.  Plaintiff verbally provided his wife's and son's names, dates of birth, addresses, and telephone numbers to Officer Takei at the accident site, who then included such information on the accident report at issue.  (Ex. E, Pl.'s Dep. Tr. 10:14–17, 17:17–18:11; *see also* Ex C.)  Even though Plaintiff's wife and son's information could under no circumstances come from the SOS, pursuant to Plaintiff's proposed class, both would still be putative class members simply because they were named in the "crash report."  As this Court

11

previously recognized, "[t]o the extent that the Schaumburg Police Department received the Pavones' personal information verbally from the Pavones – a reasonable inference given they were at the scene of the accident – this would not constitute a violation of the DPPA." *Pavone v. Meyerkord & Meyerkord, LLC*, 118 F. Supp. 3d 1046, 1054 (N.D. Ill. 2015). Accordingly, Plaintiff's use of the term "crash reports" is not an acceptable or appropriate replacement for the DPPA's requirement for "personal information from motor vehicle records."

    ii.    <u>The Name, Address, and Report Number Criteria Do Not Supplant the Requirement for an Impermissible Use</u>.

Plaintiff's limitation to reports that are obtained without using a subject's name and address or report number to search for them is presumably intended to replace the DPPA's requirement that the disclosed information was obtained for an impermissible use. In other words, Plaintiff argues that any report pulled without using name and address or report number is essentially a "blind" ordering of reports indicating that the user must be pulling them for solicitation purposes. Again, the suggestion is a *non sequitur*.

Law firms purchase accident reports for a variety of lawful reasons even if the firm did not search for the report using an individual's name and address, or report number. (*See* S. Anwar Decl. ¶ 23.) The law firm may, for example, be representing an involved party to the accident and could obtain the report using other criteria. (*Id.*) For instance, Anthony Mancini testified that his law firm would search for a report without a name and address or report number even for clients that the firm represented. (Ex. K, Mancini Dep. Tr. 62:17–63:3.) Using accident reports in connection with representing clients in a legal proceeding is expressly permitted under the DPPA. 18 U.S.C. § 2721(b)(4). And, in fact, iyeTek intended law firms to purchase accident reports for these permitted purposes. (*See* S. Anwar Decl. ¶ 23; *see also* Ex. L at ¶ 2(i).)

Plaintiff's arbitrary and irrelevant search criteria have no relation to establishing that a

law firm used information for the purpose of solicitation, and therefore do not sufficiently or accurately define a class of individuals with such a claim. Class certification should be denied. *See Chatman*, 2009 U.S. Dist. LEXIS 97594, at *15.

iii. The 24-Hour Time Limitation Is Arbitrary and Irrelevant and Has No Relation to a Solicitation Use.

Plaintiff attempts to use a 24-hour time limitation within which a crash report was procured as a proxy for the individualized proof which is required to establish that a law firm used a report for advertisement and solicitation. That is, Plaintiff's class definition tacitly suggests that any report that is pulled within 24 hours of it being released was necessarily pulled for solicitation purposes, and for no other reason.[5] The implication is absurd.

A law firm does not know when a law enforcement agency submits an accident report to iyeTek's eCommerce web portal. (S. Anwar Decl. ¶ 21.) Users are not provided any indication of when iyeTek received an accident report from an agency. (*Id.*) IyeTek's web portal also does not permit users to search for accident reports using such temporal criteria. (*Id.*) Thus, the fact that a law firm may have purchased an accident report within 24 hours of its release would be completely coincidental and unrelated to the law firm's alleged intended use. In fact, Mancini purchased Plaintiff's accident report *five* days after the report at issue became available for purchase on iyeTek's web portal, but Plaintiff still alleges that Mancini solicited him in violation of the DPPA. (*See* Ex. F; *Mancini* Case, Dkt. No. 5.) Clearly, the timing of when a report was purchased has no connection to whether the user intended to solicit the subject of the report for

---

[5] Significantly, for the purposes of this Motion and without any explanation, Plaintiff changed his class definition from persons whose accident reports were obtained within 24 hours of the time of the accident, (TAC ¶ 41), to persons whose accident reports were obtained within 24 hours of when the report became available for purchase on iyeTek's eCommerce web portal, (Pl.'s Mot. at 3–4). Regardless, neither proxy suffices to show that the reports were obtained for a purpose not permitted under the DPPA.

an impermissible use under the DPPA.

Ultimately, Plaintiff's class definition is wholly disconnected from the elements of his DPPA claim, and actually encompasses individuals who have no possible claim under the DPPA. Accordingly, the Court must deny Plaintiff's Motion and decline certification of the proposed class. *See Kohen,* 571 F.3d at 679; *Chatman*, 2009 U.S. Dist. LEXIS 97594, at *15.

iv.     Plaintiff's Class Definition Is Overly Broad and Includes Individuals Who Cannot State Any Claim under the DPPA.

It has long been established that no class may be certified where "the class would improperly include members who could not prove an element of the asserted . . . claim." *Lindh v. Dir. Fed. Bureau of Prisons* No. 2015 WL 179793, at *3 (S.D. Ind. Jan. 14, 2015) (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006)). "Overbroad class descriptions violate the definiteness requirement because they include individuals who are without standing to maintain the action on their own behalf." *Duffin v. Exelon Corp.*, 2007 WL 845336, at *3 (N.D. Ill. Mar. 19, 2007). Thus, "if the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad." *Kohen*, 571 F.3d at 677.

Here, Plaintiff's class definition is overbroad because it includes individuals who cannot state any claim under the DPPA under any circumstances. For instance, Plaintiff's wife and child would be included in Plaintiff's class, yet they did not have any "personal information from a motor vehicle record" that was disclosed by the accident report in this case. In fact, Plaintiff's wife did not even have a driver's license to provide information from, and also never presented her state identification card to the officer. (Ex. D, K. Pavone Dep. Tr. 11:6–18.) Likewise, Plaintiff's minor son did not have any identification or other DMV record. (*Id.* at 26:21–24.) Because Plaintiff's class definition does not include the DPPA requirement that the personal information at issue be derived from a "motor vehicle record," the class is overly inclusive.

14

Similarly, because Plaintiff's class definition does not include the DPPA's requirement that the personal information be disclosed or obtained for an impermissible purpose, the class necessarily includes individuals whose information was pulled or obtained for a permissible purpose and therefore have no actionable claim under the DPPA. Finally, absent any "knowledge" requirement, Plaintiff's class will necessarily include all individuals whose information was ever disclosed by iyeTek, even unknowingly, for an impermissible purpose. Therefore, Plaintiff's class is overly broad and cannot be certified.

### B. The Defects in Plaintiff's Class Definition Cannot Be Cured Because No Class Is Identifiable.

Even if Plaintiff's class definition was drafted in accordance with the elements of a DPPA claim, the class would still not be certifiable as it would still be indefinite, uncertain, and over inclusive. Rule 23 requires that "the class must be sufficiently defined so that it is identifiable." *Chatman*, 2009 U.S. Dist. LEXIS 97594, at \*7, fn. 2 (N.D. Ill. Oct. 20, 2009); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495 (7th Cir. 2012) (When "there is no way to know or readily ascertain who is a member of the class," the class "lacks the definiteness required for class certification."); *see also EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (courts have "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'"). If "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *EQT*, 764 F.3d at 358 (citations omitted).

Here, the elements of the DPPA will always require individualized inquiries no matter how the class definition is stated, such that class members cannot be readily identified absent specific ad hoc investigation. For example, the complained-of disclosure of personal information would always be in relation to the crash reports. Yet, as detailed above, the information inputted

15

into crash reports could come from a variety of sources.  Thus, for each member of the class, an investigation would be required to determine where the information from that person's respective crash report was derived.

██████████████████████████████████████████████

**Ex. B**, A. Takei Dep. 40:3–8).[6]

████████████████████████████████████████████████████████ And as the deposition of Officer Takei exemplifies, reporting officers are likely unable to remember such details.  (*See* Ex. B, A. Takei Dep. Tr. 40:3–8) (testifying that he cannot tell from the face of Plaintiff's accident report where he obtained the information inputted on the report).

Similarly, even assuming *arguendo* that class members could be identified by the search criteria used to locate and pull their crash reports (which is flatly denied), it is undisputed that iyeTek's records do not identify what search criteria were used to search for an accident report. (S. Anwar Decl. ¶ 20.)  Accordingly, it is impossible (without deposing every user) to identify and exclude individuals whose reports may have been purchased using a name and address or

---

[6] Plaintiff apparently relies on the theory espoused in his motion for summary judgment in the Mancini Case; that being, "information obtained from a driver's license is information obtained from a motor vehicle record."  *Pavone v. Law Offices of Anthony Mancini, Ltd.*, 2016 WL 4678311, at *4 (N.D. Ill. Sept. 7, 2016).  In that case, the Court distinguished contrary case law by asserting that "Pavone's handing of his license to the officer was anything but voluntary."  *Id.* at *13.  Defendants respectfully disagree with the holding in the Mancini case.  But even if that court were correct on the law, the holding creates factual issues (such as whether a motorist was compelled to produce his driver's license) that require individualized analysis.

accident report number.[7]   Thus, even Plaintiff's flawed class definition, by including search criteria as an element, establishes that a class is not ascertainable.  (Pl.'s Mot. at 14.)  Because there is no class definition that could sufficiently identify class members, even when stated using the elements of a DPPA claim, Plaintiff's Motion and the requested class certification should be denied with prejudice.

## II.     Plaintiff Failed to Meet the Requirements of Rule 23(a).

Not only has Plaintiff failed to state an adequate class definition, but he has also failed to meet the demanding requirements of Rule 23.  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart*, 131 S. Ct. at 2551.  A party must "'be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)."  *Comcast Corp.*, 133 S. Ct. at 1432.  In this case, Plaintiff has failed to prove these requirements including commonality, typicality, predominance and superiority of the claims in this class action.  As such, Plaintiff's Motion must be denied.

### A.     There Are No Common Answers to the Central Questions of Liability in This Case.

Rule 23(a)(2) requires a class proponent to identify questions of fact or law that are common to the class. Fed. R. Civ. P. 23(a)(2).  *Dukes* clarified, however, that raising a common "question" is not enough.  564 U.S. at 349 ("[A]ny competently crafted class complaint literally raises common 'questions.'").  The chief concern is instead "the capacity . . . to generate common answers" that can "resolve an issue that is central to the validity of each one of the claims *in one strok*e."  *Dukes*, 564 U.S. at 350 (emphasis added).  "Dissimilarities within the

---

[7] Indeed, "subject's address" was never an available search criterion on iyeTek's eCommerce web portal.  (S. Anwar Decl. ¶ 19.)

proposed class are what have the potential to impede the generation of common answers." *Id.* Thus, "if resolving the common legal issue depends on factual determinations that would require individualized inquiry for each class member, commonality is not met." *Parkis v. Arrow Fin. Servs., LLC*, 2008 WL 94798, at *4 (N.D. Ill. Jan. 8, 2008).

In addition, to certify a class pursuant to Rule 23(b)(3), as Plaintiff seeks to do here, the class proponent must demonstrate that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Although similar to commonality, the predominance criterion is far more demanding." *Wilkins v. Just Energy Grp., Inc.*, 308 F.R.D. 170, 184 (N.D. Ill. 2015). To satisfy the predominance requirement, "common questions [must] represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Id.* (quoting *Messner v. Northsore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)). "Assessing predominance 'begins, of course, with the elements of the underlying cause of action.'" *Id.* at 185 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)). The court must "consider[] whether the evidence relevant to the elements of that cause of action is common or specific to an individual." *Id.*

Plaintiff asserts that the common question in this case is whether iyeTek "knowingly violated DPPA section 2722 when is [sic] sold crash reports to law firms immediately after (within 24 hours) when they were completed, when the law firm purchases did not have the names and addresses of the persons involved in the accident or the crash report number." (Pl.'s Mot. at 15.) Any response to this "common question" must be addressed by separately addressing each element of the inquiry, namely, (1) whether iyeTek's conduct was knowing, (2) whether the crash reports contained "personal information from a motor vehicle record," and (3)

whether the personal information was used for an impermissible purpose. As discussed hereinabove, each of these sub-issues requires an individualized inquiry to which there can be no answer that will be common to an entire class of individuals.

      i.    <u>IyeTek's Knowledge as to Each Class Member Is an Individualized Inquiry.</u>

Whether iyeTek "knowingly" disclosed personal information to law firms for an improper purpose is a two-step inquiry. First, it must be established that each law firm to whom information was disclosed intended to use the information for an impermissible use. In this regard, plaintiff must prove that each law firm had the "predominant purpose" to solicit. *Maracich*, 133 S. Ct. at 2206–07. The Supreme Court has recognized that "a communication sent with DPPA-protected information may serve more than one objective." *Maracich*, 133 S. Ct. at 2206. Thus, while in some instances the law firm's "purpose might be evident from the communication itself," in other instances, the court may have to consider the law firm's "whole course of conduct . . . in determining whether solicitation was the predominant purpose of the act alleged to be wrongful." *Id.* at 2207. In other words, the Court would need to undertake an individualized analysis of not only the purported solicitation letters sent to putative class members, but also possibly the law firm's "whole course of conduct," to determine whether solicitation was the law firm's predominant purpose.

Once this threshold inquiry is completed, and assuming that Plaintiff is able to prove this "predominant purpose" of solicitation as to every law firm throughout the country that purchased reports from iyeTek (an impossible task), Plaintiff must then prove that iyeTek knew of this impermissible use as to each and every law firm that purchased reports from it. (*See* Pl.'s Mot. at 8.) Clearly, both steps of this inquiry process are individual in nature. *See Jacobs v. Osmose, Inc.*, 213 F.R.D. 607 (S.D. Fla. 2003) ("By its very nature, knowledge is a highly personalized

19

and individualized concept.").  There is no possibility that this issue can be investigated and answered on a class-wide basis.

Notwithstanding the above, it is clear that Plaintiff cannot prove this element even for his own claim.  Both Meyerkord and Mancini signed commercial account agreements with iyeTek in which they acknowledged that they would not use iyeTek's eCommerce web portal for commercial solicitation purposes.  (S. Anwar Decl. ¶ 24; *see also* Ex. L at ¶ 2(i).)



Thus, the evidence illustrates that Plaintiff cannot prove on a class-wide basis iyeTek's purported knowledge of solicitations, let alone even for Plaintiff's own claim.  Instead, the Court would need to undertake an individualized review of each law firm's purpose and iyeTek's knowledge of each law firm's purpose.



ii.  Whether the Crash Reports Contained "Personal Information from a Motor Vehicle Record" Is an Individualized Inquiry.

Plaintiff falls short even with his position that a class could possibly get certified if every accident report in the nation were created exactly the same way, with information coming from the same official sources, and according to a non-existent nationwide standard operating procedure for creating accident reports.  (*See* Pl.'s Mot. at 5–6.) .  While such a class would still fail due to individual issues regarding the ultimate use of the information by a law firm customer and other reasons, Plaintiff's own theory only further underscores why he has failed to meet the requirements of Rule 23.In this respect, Plaintiff attempts to assert that there is a "standard police protocol" that officers follow in "every instance."  (*Id*. at 5.)  This purported protocol involves "[a]sking for a driver's license and proof of insurance," transferring certain information from a driver's license into a police "cruiser's data terminal," and then "corroborating" that information with the Illinois Secretary of State ("SOS") records.  (*Id*. at 5–6.)  However, the evidence in this case dispels any notion that there is a local or nationwide common practice for creating an accident report.

Specifically, each state has its own statutes and regulations regarding the preparation and disclosure of accident reports.  *See, e.g.,* 625 ILCS 5/11-416 ("law enforcement agencies of local authorities may furnish copies of traffic accident reports prepared by such agencies and may receive a fee not to exceed $5 for each copy.").  For instance, Florida and Michigan have a 60-day and 30-day "cooling off" period during which LEAs cannot disclose the reports for commercial solicitation purposes.  *See* Fla. Stat. § 316.066(f)(2)(a); MCLS § 257.503(1).

At this time, the iyeCrash software is only available in 14 states.  (S. Anwar Decl. at ¶ 13.)  Not all LEAs within each state, however, use the software.  (*Id*.)  For agencies that do employ the software, the agencies may have different technological capabilities and therefore

may use iyeCrash in varying ways. ████████████████████████████████████

████████████████████████████ Even within the agencies that possess the requisite software capabilities, there is no standard operating procedure that requires all police officers to follow the same steps in responding to an accident scene and preparing an accident report. (Ex. B, A. Takei Dep. Tr. 41:2–18.) In other words, officers need not use the iyeCrash software even if it is available; nor do officers use the software in the same manner. (*See id*.) Plaintiff provides no evidence regarding a nationwide practice for preparing and creating accident reports. To the contrary, the evidence demonstrates that there is no standard practice even within the same LEA. (S. Anwar Decl. ¶ 14.)

As Officer Takei testified, "[e]very situation is dynamic" and "no 2 crashes, as similar as they may be, are going to be exactly the same." (*Id*. at 15:7–9.) In order to allow officers the flexibility required to respond to the specific circumstances of each accident scene, Officer Takei confirmed that "there is no mathematical formula" that officers are required to follow. (*Id*. at 15:9–10.)

More specifically, police officers can obtain information for an accident report through a variety of sources, not just a driver's license. ████████████████████████████████

████████████████████████████████████████ Officers may choose to interview the involved party, take the information down on their scratch pad, and manually type that information in the system to create an accident report. (*Id*. at 25:13–17.) In other situations, if the iyeCrash software is not operating properly, the officer may resort back to paper reports. (*See* Ex. B, A. Takei Dep. Tr. 38:13–39:7.) An officer may also have to manually fill in an accident report if, for example, a person's name or address on his or her driver's license was

inaccurate. (*Id*. at 45:1–20.) Indeed, as this case demonstrates, not all individuals at an accident scene even possess a driver's license. (Pl.'s Mot., Ex. 4 at 32) ("*When possible*, obtain [the name of the persons involved] from the driver license.") (emphasis added). Even plaintiff's wife in this case only had a state identification card, while their son had no identification. (Ex. D, K. Pavone Dep. Tr. 11:6–11; 26:21–24.) Even if individuals had a driver's license, they may have changed their names and addresses (*e.g.,* if they got married or moved) from the information appearing on their driver's license. (Ex. B, A. Takei Dep. Tr. 45:1-20.) In that scenario, as Officer Takei testified, an officer would fill in the new information manually. (*Id.*) Determining whether information on an accident report came "from a motor vehicle record," or a driver's license as alleged in this case, would therefore require an individual analysis.

Similarly, Plaintiff's theory that it is "standard police protocol" to transfer driver's license information into a police officer's data terminal and then "corroborate" such information with the Illinois SOS records is entirely unsupported by the record. (*See* Pl.'s Mot. at 5–6.) As described above, not all LEAs possess the software capabilities required to create accident reports electronically. (*See* S. Anwar Decl. ¶¶ 13–14.) Even where the functionality is generally available, the software may not be operating properly when an officer is attempting to create an accident report and the officer may resort back to paper or the officer may choose not to use the software for a variety of reasons. (*See* Ex. B, A. Takei Dep. Tr. 38:13–39:7.) Moreover, the SOS certainly does not possess records of every individual listed on an accident report. Plaintiff's son, for example, was only one and a half years old at the time of the accident. (Ex. D, K. Pavone Dep. Tr. 11:1–5.) As Plaintiff's wife testified, the Illinois SOS would have no

23

record of Plaintiff's son because of his age. (*Id*. at 26:21–24.)[9]

Importantly, Plaintiff's only citation for his purported nationwide theory is from the deposition testimony of Officer Takei. (Pl.'s Mot. at 5–6.) But even Officer Takei testified that police officers just within the Schaumburg PD may have different preferences for how to create an accident report. (Ex. B, A. Takei Dep. Tr. 41:11–13.) There is no standard operating procedure that requires all Schaumburg PD officers to follow the same steps in preparing accident reports, let alone a nationwide standard. (*Id*. at 41:2–18.) Even Officer Takei himself does not always follow the same procedures and instead must adapt to the circumstances presented at the scene of the accident. (*See id*. at 15:1–10.) If there are no standard operating procedures within the same law enforcement agency (and no standard procedures followed by even a single officer), there certainly can be no such standards nationwide.

iii.     The Permissibility of Each Law Firm's Use of the Information Disclosed Is an Individualized Inquiry.

As described above, in order to sustain a class, the Court would need to examine the permissibility of each law firm's use of the disclosed information to determine whether that law firm intended to use the information in a manner not permitted by the DPPA. 18 U.S.C. § 2721(b); *Maracich*, 133 S. Ct. at 2199. The inquiry would clearly be an individualized analysis as the DPPA provides *fourteen* exceptions to its general ban on disclosure. 18 U.S.C. § 2721(b). A law firm could purchase an accident report for a variety of lawful reasons, including in connection with representing an involved party to the accident or their insurance company, to conduct an investigation in anticipation of litigation, pursuant to a court order, or for any other

use as consented to by the individual to whom the information pertains. *See* 18 U.S.C. § 2721(b)(4), (6), (13).

Significantly, there is no mechanism available to make any class-wide determinations on this issue. There is no evidence that every putative class member across the country received a solicitation letter from a law firm. An individualized inquiry on this issue would even be required with respect to the accident reports purchased by only Meyerkord and Mancini. (*See* Ex. M, Meyerkord Dep. Tr. 69:2–8; Ex. K, Mancini Dep. Tr. 62:17–63:3) (testifying that the law firms would obtain accident reports in connection with representing a client). Plus, even if the putative class members received purported solicitation letters, the Court would need to analyze each letter to determine the law firms' "predominant purpose." *See Maracich*, 133 S. Ct. at 2206. Therefore, the alleged impermissible purpose of solicitation is not readily apparently across the putative class for purposes of determining certification.



The tokens varied by agency and also varied within each agency over time. (S. Anwar Decl. ¶ 19.) Thus, determining what each law firm's access to these reports was and what their disclosed uses were across the country would require "an inherently particularized inquiry" unsuited for class treatment. *See Jamie S.*, 668 F.3d at 498;

*see also Messner*, 669 F.3d at 815 ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question."). Plaintiff's motion must therefore be denied as there is no commonality.

### B.    <u>Plaintiff's Class Also Fails to Satisfy the Typicality Requirement.</u>

Pursuant to the Federal Rules of Civil Procedure, a class representative must also show that the claims of the representative party are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F. 3d 584, 597 (7th Cir. 1993). "[T]he requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Oshana*, 472 F.3d at 514 (citations and internal quotation marks omitted).[10]

As acknowledged in his opening brief, Plaintiff's DPPA claim turns on the fact that the information on his accident report was obtained from his driver's license, supposedly "corroborated" by the Illinois SOS, and purchased by Meyerkord within 24 hours of being available (without searching by Plaintiff's name and address or report number), who then sent him solicitation letters. (*See* TAC ¶¶ 13, 29; Pl.'s Mot. at 5, 8–11.) Plaintiff's unique circumstances make him an atypical representative for:

- Persons, such as Karen Pavone and Plaintiff's son, whose information was not obtained from a driver's license, (Ex. E, Pl.'s Dep. Tr. 10:14–17, 17:17–18:11);
- Persons whose accident reports were prepared using means other than the iyeCrash software;

---

[10] Because "[t]he commonality and typicality requirements of Rule 23(A) tend to merge," for the same reasons as to why commonality is lacking, Plaintiff is also atypical of the proposed class. *Falcon*, 457 U.S. at 158 n.13.

- Persons, such as Plaintiff's son, whose information was not (and could not have been) "corroborated" by the Illinois SOS, (Ex. D, K. Pavone Dep. Tr. 26:21–24);
- Persons who never received any solicitations from law firms based on information obtained in accident reports, (Ex. M, Meyerkord Dep. Tr. 69:2–8; Ex. K, Mancini Dep. Tr. 62:17–63:3.)

Nonetheless, each of these groups of people, among many others, is included in Plaintiff's proposed class. Because the variations in Plaintiff's claim from that of the putative class members "strikes at the very heart" of his DPPA claim, Plaintiff cannot satisfy Rule 23's typicality requirement. *Souter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 265 (4th Cir. 2012).

Plaintiff's claim is also atypical of putative class members who suffered no actual damages. The DPPA provides for an award of "actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b)(1). A split of authority exists as to whether a plaintiff must prove actual damages in order to be entitled to an award of liquidated damages. *Potocnik v. Carlson*, 2016 WL 3919950, at *12  (D. Minn. July 15, 2016) (holding that to recover liquidated damages for a DPPA violation, a plaintiff must first prove that he suffered actual injury); *cf. Parus v. Kroeplin*, 2006 WL 278374, at *2 (W.D. Wis. Jan. 31, 2006) ("If a plaintiff proves that his rights under the Act were violated, but is unable to show actual damages, he is entitled to receive liquidated damages in the amount of $2,500.") (citing cases).

Here, Plaintiff claims that he suffered actual damages in the form of emotional distress. (*See* Pl.'s Mot. at 11.) Plaintiff's claims of actual damages make him an atypical class representative for putative class members who did not suffer any such damages. In other words, Plaintiff's claims would fail to "advance the interests" of putative class members who possess no actual damages. *Souter*, 298 F. App'x at 264. Put differently, Plaintiff's claim for liquidated damages has "meaningful differences" from putative class members who did not suffer any

actual harm and who may or may not be able to recover under the DPPA. *See id*. at 265. Plaintiff's claims of actual damages are also not reflected in his poorly crafted class definition, and further illustrate that individual issues predominate in this case.

### C.    Plaintiff Also Cannot Satisfy the Superiority Prong of Rule 23.

Rule 23 also requires Plaintiff to prove that proceeding as a class "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Most significant here, "the likely difficulties in managing a class action" preclude a finding of superiority. Fed. R. Civ. P. 23(b)(3)(D). "The volume of [the] individual liability determinations [here] would render this case totally unmanageable as a class action." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439 (N.D. Ill. 2003) (citing cases).

As noted above, the Court would need to conduct extensive individual determinations regarding iyeTek's knowledge as well as the source of the information on a putative class member's accident report and a law firm's purpose for obtaining that report. This class action would necessarily involve an overwhelming and unmanageable number of mini-trials to resolve these core issues affecting liability.

Plaintiff's sole claim in support of his superiority argument is that "the cost of pursuing individual litigation to seek recovery against a well-financed adversary is not feasible for most drivers here." (Pl.'s Mot. at 22.) But this is not a case "involving relatively low-cost goods or services" "where class treatment is often most needed." *Mullins*, 795 F.3d at 658. To the contrary, the DPPA provides for actual damages, but not less than liquidated damages of $2,500, as well as attorneys' fees. 18 U.S.C. § 2724(b). The putative class members would therefore have a significant interest in pursuing their own individual claim. *See* Fed. R. Civ. P. 23(b)(3)(B).

### III. __The Requested Relief Is Improper and Moot.__

Plaintiff also seeks to certify a Rule 23(b)(2) class and "enjoin [iyeTek] from selling any crash report to any law firm unless that law firm can certify that it represents the accident victim who is the subject of the crash report or is defending a lawsuit already brought by that car accident victim." (Pl.'s Mot. at 19.) Plaintiff's request to certify a Rule 23(b)(2) class should be denied because Plaintiff has failed to satisfy the elements of Rule 23(a) as described above. *See* Fed. R. Civ. P. 23(b) (a class action may only be maintained if Rule 23(a) is first satisfied). Plaintiff's request should also be denied because this case falls outside the purview of Rule 23(b)(2). *See Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 493 (S.D. Ill. 1999).

Rule 23(b)(2) provides for certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Court must find that the opposing parties' conduct or refusal to act was generally applicable to the class and that final injunctive relief or declaratory relief with respect to the entire class would be the appropriate remedy." *Clay*, 188 F.R.D. at 494. "'As a general matter, Rule 23(b)(2) is invoked in cases where injunctive or declaratory relief is the primary or exclusive relief sought.'" *Id.* at 494. The use of Rule 23(b)(2) is therefore limited to cases where the injunctive or declaratory relief is "'the predominant remedy requested for the class members.'" *Id.* (citation omitted). If the case "relates exclusively or predominantly to money damages," then certification under Rule 23(b)(2) is improper. *Id*.

This case revolves around Plaintiff's claim for $2,500 in liquidated damages on behalf of himself and the putative class members. (*See* Pl.'s Mot. at 4.) He claims actual damages in the hopes of recovering statutory liquidated damages. (*See id*. at 11.) Plaintiff's focus is not on

equitable relief and restricting the disclosure of accident reports. Indeed, Plaintiff has made no attempt to contact any law enforcement agency to restrict public access to his accident report. (Ex. E, Pl.'s Dep. Tr. 64:20–24.) Nor has Plaintiff moved for a preliminary injunction on the sale of accident reports on iyeTek's eCommerce web portal. Instead, the predominant remedy Plaintiff seeks in this case is monetary damages. Rule 23(b)(2) certification is therefore improper. *Clay*, 188 F.R.D. at 494.

Moreover, Plaintiff's requested relief is improper because it implies that law firms can only have one permissible purpose under the DPPA – the representation of an accident victim. But such assumption is patently untrue and runs contrary to section 2721(b). The Supreme Court recognized that law firms may have more than one objective when sending a communication with DPPA-protected information. *Maracich*, 133 S. Ct. at 2206–07. Plaintiff's attempt to limit law firms' use of accident reports for lawful purposes should not be permitted.

Finally, the injunctive relief Plaintiff seeks is – and was – already in place. IyeTek's commercial account agreement prohibited the use of accident reports for commercial solicitation purposes. (**Ex. L** at ¶ 2(i).) Likewise, iyeTek's web portal contained the same solicitation prohibition. (**Ex. N**.) ███████████████████████████████

███████████████████████████████████████

█ Thus, Plaintiff's lawsuit has no meaningful purpose.

## CONCLUSION

For the foregoing reasons, Defendants LexisNexis Risk Solutions Inc. and iyeTek, LLC respectfully request that the Court deny Plaintiff's Motion for Class Certification.

Dated: December 16, 2016                    Respectfully submitted,

                                            By: /s/ Ronald I. Raether, Jr.
                                            Ronald Irvin Raether, Jr.
                                            Admitted *Pro Hac Vice*
                                            5 Park Plaza, Suite 1400
                                            Irvine, CA 92614-2545
                                            Telephone: (949) 622-2722
                                            Facsimile: (949) 622-2739
                                            Email: ronald.raether@troutmansanders.com

                                            Tyler S. Mertes (No. 6283522)
                                            TROUTMAN SANDERS LLP
                                            55 W. Monroe St., Suite 3000
                                            Chicago, IL 60603
                                            Telephone: (312) 759-5948
                                            Facsimile: (773) 877-3742
                                            Email: tyler.mertes@troutmansanders.com

                                            Mark C. Mao
                                            Admitted *Pro Hac Vice*
                                            580 California Street, Suite 1100
                                            San Francisco, CA 94104
                                            Telephone: (415) 477-5700
                                            Facsimile: (415) 477-5710
                                            Email: mark.mao@troutmansanders.com

                                            Julie D. Hoffmeister
                                            Admitted *Pro Hac Vice*
                                            TROUTMAN SANDERS LLP
                                            1001 Haxall Point
                                            Richmond, Virginia 23219
                                            Telephone: (804) 697-1448
                                            Facsimile: (804) 697-1339
                                            Email: julie.hoffmeister@troutmansanders.com

                                            *Attorneys for Defendant LexisNexis Risk Solutions*
                                            *Inc. and iyeTek, LLC*

## CERTIFICATE OF SERVICE

 The undersigned certifies that a copy of the above and foregoing pleading was served on

December 16, 2016 via the Court's CM/ECF system on all attorneys of record:

Roger Zamparo, Jr.
Zamparo Law Group, P.C.
2300 Barrington Road, Suite 140
Hoffman Estates, IL 60169
Telephone: (224) 875-3202
Email: roger@zamparo.com

James A. Francis
John Soumilas
Lauren KW Brennan
Francis & Mailman, P.C.
Land Title Building, 19th Floor
Philadelphia, PA 19110
Telephone: (215) 735-8600
Email: jfrancis@consumerlawfirm.com
Email: jsoumilas@consumerlawfirm.com
Email: lbrennan@consumerlawfirm.com

*Attorneys for Plaintiff*

Ben Barnow
Erich P. Schork
Jeffrey D. Blake
Barnow and Associates, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Email: b.barnow@barnowlaw.com
Email: e.schork@barnowlaw.com
Email: j.blake@barnowlaw.com

*Attorneys for Defendant Meyerkord & Meyerkord, LLC*

      By: /s/ Ronald I. Raether, Jr.
      Ronald Irvin Raether, Jr.
      Admitted *Pro Hac Vice*
      5 Park Plaza, Suite 1400
      Irvine, CA 92614-2545
      Telephone: (949) 622-2722
      Facsimile: (949) 622-2739

Email: ronald.raether@troutmansanders.com

29540281v6