# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ANTONIO PAVONE, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) Case No. 15 C 1539 |
| v. | ) ) |
| MEYERKORD & MEYERKORD, LLC, et al., | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On February 26, 2016, Plaintiff Antonio Pavone filed a Third Amended Class Action Complaint against Defendants Meyerkord & Meyerkord, LLC ("Meyerkord"), LexisNexis Claims Solutions, Inc. ("LN Claims"), and iyeTek, LLC ("iyeTek")[1] for violating the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et seq*. ("DPPA"). Before the Court is Plaintiff's motion to certify two putative classes pursuant to Federal Rule of Civil Procedure 23. For the following reasons, the Court, in its discretion, denies Plaintiff's motion for class certification.

## FACTUAL BACKGROUND

Plaintiff, his wife, and their child were involved in an automobile accident with another vehicle on the afternoon of January 15, 2015 in Schaumburg, Illinois. Schaumburg Police Officer Alan Takei responded to the accident scene. Plaintiff presented his driver's license and

---

[1] Counsel for Plaintiff and Defendants stipulated that LN Claims is the entity who will bear liability should a judgment be entered against iyeTek in this matter. (R. 118, 10/31/16 Stip.) Accordingly, the Court substitutes LN Claims as a named Defendant in lieu of LexisNexis Risk Solutions, Inc.

insurance card to Officer Takei. Plaintiff verbally provided his wife's and son's names, dates of birth, address, and telephone numbers to Officer Takei. Officer Takei then created an accident report – as required by Illinois statute 625 ILCS 5/11-408 – based on this information using iyeTek's "iyeCrash" software. Plaintiff refers to this accident report as an "Illinois Traffic Crash Report." Pursuant to a contractual relationship, the Schaumburg Police Department sent Plaintiff's accident report to iyeTek, which then made it available on iyeTek's eCommerce web portal.

On January 16, 2015, Defendant Meyerkord, a law firm, purchased a copy of Plaintiff's accident report and then sent solicitation parcels to Plaintiff, his wife, and their young son at their home address. Each parcel stated that it was "ADVERTISING MATERIAL." On February 4, 2015, Plaintiff's counsel notified the Schaumburg Police Department that Plaintiff had received advertising materials from Meyerkord. The following day, the Schaumburg Police Department notified iyeTek of Plaintiff's complaint. Upon being notified, iyeTek conferred with the Schaumburg Police Department and then terminated Meyerkord's commercial account. After Plaintiff filed the present lawsuit on February 19, 2015 – approximately a month after his car accident – Meyerkord ceased its direct mail marketing campaign.[2]

---

[2] Although the parties filed certain documents under seal and redacted portions of their legal memoranda, the Seventh Circuit has held that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht,* 622 F.3d 697, 701 (7th Cir. 2010); *see also United States v. Foster,* 564 F.3d 852, 853 (7th Cir. 2009) (sealed documents "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.").

Based on these allegations, Plaintiff has proposed the following state-wide class definition for the Meyerkord class in relation to his DPPA claim:

> All natural persons with an address in the state of Illinois who were the subjects of an Illinois Traffic Crash Report, to whom, within four years prior to the filing of this action and extending through the resolution of this action, Defendant Meyerkord & Meyerkord, LLC sent correspondence marked "ADVERTISING MATERIAL" substantially similar in form to the correspondence it sent to Plaintiff Antonio Pavone, but the class excludes non-drivers identified on the Illinois Traffic Crash Reports, any officers of Defendants, as well as the lawyers in this case and the judge assigned to this case.

Plaintiff also seeks to certify a nationwide class against LN Claims for selling car accident crash reports to law firms such as Meyerkord. In the context of his DPPA claim, Plaintiff proposes the following nationwide class:

> All persons residing within the United States and its Territories about whom, within four years prior to the filing of this action and extending through the resolution of this action, Defendant Lexis sold a crash report to a law firm within 24 hours of the time the report became available for purchase on Defendant's e-commence web-portal, but excluded from the class are the subjects of those reports obtained by any law firm using the name and address of the subject or the subject's accident report number, and also excluded from the class are any officers of Defendants, as well as the lawyers in this case and the judge assigned to this case.

In the present motion, Plaintiff states that he is seeking: (1) an injunction against Meyerkord, preventing the firm from obtaining any crash report unless it can certify that it represents the accident victim who is the subject of the crash report; (2) an injunction against iyeTek, preventing it from selling any crash report to any law firm unless that firm can certify that it represents the accident victim who is the subject of the crash report or is defending a lawsuit already brought by that car accident victim; (3) compensation in the form of $2,500 in liquidated damages for every class member against every defendant who violated that class member's DPPA rights; (4) punitive damages; as well as (5) reasonable attorneys' fees and

3

litigation costs as provided by 18 U.S.C. § 2724.

## CLASS CERTIFICATION STANDARD

To obtain class certification under Federal Rule of Civil Procedure 23, a plaintiff must satisfy each requirement of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – and one subsection of Rule 23(b). *See McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 800 (7th Cir. 2017); *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 513 (7th Cir. 2009). Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting individual members" and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). In addition, Plaintiff seeks class certification under Rule 23(b)(2), which allows certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 441 (7th Cir. 2015). Plaintiff carries the burden of demonstrating compliance with Rule 23 by a preponderance of the evidence. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017); *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012).

The Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Mulvania*, 850 F.3d at 859 (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 629 (7th Cir. 2001)). Nevertheless, class certification is only appropriate if the Court "'is satisfied, after a rigorous analysis, that the prerequisites' for class certification have been met."

*Bell*, 800 F.3d at 373 (quoting *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 723 (7th Cir. 2011)); *see also Blow v. Bijora, Inc.*, ___ F.3d ___, 2017 WL 1731494, at *9 (7th Cir. May 4, 2017). In conducting the Rule 23 analysis, courts should "not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811. Where an issue affects class certification, however, "a court may not simply assume the truth of the matters as asserted by the plaintiff," *see id.*, because "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, "[i]f there are material factual disputes that *bear on the requirements for class certification*, the court must 'receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class.'" *Bell*, 800 F.3d at 377 (emphasis in original) (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Therefore, the class certification inquiry "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 350–51; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) ("class determination generally involves considerations that are enmeshed in the factual and legal issues.") (citation omitted).

## DRIVER'S PRIVACY PROTECTION ACT

"The DPPA regulates the disclosure of personal information contained in the records of state motor vehicle departments (DMVs)." *Maracich v. Spears*, 133 S. Ct. 2191, 2195 (2013). The DPPA prohibits "private individuals from 'knowingly ... obtain[ing] or disclos[ing] personal information, from a motor vehicle record, for any use not permitted under Section 2721(b).'" *Graczyk v. West Pub. Co.*, 660 F.3d 275, 277 (7th Cir. 2011) (quoting 18 U.S.C. § 2722(a)); *see also Maracich*, 133 S.Ct. at 2199 (A person "who knowingly obtains, discloses or uses personal

information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains.") (quoting 18 U.S.C. § 2724(a)). "The DPPA, however, does not prohibit all unconsented disclosures of personal information." *Graczyk,* 660 F.3d at 277; *see also Maracich,* 133 S. Ct. at 2195 ("Disclosure of personal information is prohibited unless for a purpose permitted by an exception listed in 1 of 14 statutory subsections."). The DPPA "also regulates the resale and redisclosure of drivers' personal information by private persons who have obtained that information from a state DMV." *Reno v. Condon,* 528 U.S. 141, 146 (2000).

To establish a claim under the DPPA, a plaintiff must show that the defendant: (1) knowingly obtained, disclosed, or used personal information; (2) from a motor vehicle record; (3) for a purpose not permitted under the DPPA. *See Maracich*, 133 S.Ct. at 2199; *Graczyk*, 660 F.3d at 277; *Pavone v. Law Offices of Anthony Mancini, Ltd.*, 205 F. Supp. 3d 961, 963 (N.D. Ill. 2016). "[E]ven if a document is created by the police, the DPPA protects any information in the report that the police obtained *from* the motor vehicle record." *Pavone v. Law Offices of Anthony Mancini, Ltd.,* 118 F. Supp. 3d 1004, 1007 (N.D. Ill. 2015) (emphasis in original) (citing *Senne v. Vill. of Palatine,* 695 F.3d 597, 599 (7th Cir. 2012) (en banc)).

## ANALYSIS

### I. Commonality and Predominance

The Court begins with the closely related questions of commonality and predominance because they can "overlap in ways that make them difficult to analyze separately." *See Bell*, 800 F.3d at 374; *see also Chicago Teachers Union,* 797 F.3d at 443 ("To some extent the question of commonality ... and the question of predominance overlap"); *Balderrama-Baca v. Clarence*

*Davids & Co.,* 318 F.R.D. 603, 613 (N.D. Ill. 2017) ("Rule 23(b)(3) builds upon Rule 23(a)'s requirement of commonality."). The Supreme Court has reasoned that it "is easy to misread" the commonality requirement because "[a]ny competently crafted class complaint literally raises common 'questions.'" *Wal-Mart*, 564 U.S. at 349 (citation omitted). As the Seventh Circuit instructs "superficial common questions – like whether each class member is a [] student or whether each class member 'suffered a violation of the same provision of law' – are not enough." *Jamie S. v. Milwaukee Public Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350). Rather, the common question must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart,* 564 U.S. at 350.

Predominance is similar to commonality but "the predominance criterion is far more demanding." *McCaster*, 845 F.3d at 800 (citations omitted). "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). "Predominance is a qualitative rather than a quantitative concept" and "is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014). Simply put, a plaintiff does not satisfy the predominance requirement if individual questions overwhelm questions that are common to the class. *See Parko,* 739 F.3d at 1085 (citing *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1193 (2013)). The predominance analysis begins with the elements underlying the plaintiff's cause of action. *See Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 809 (2011).

### A. Illinois Class

Plaintiff asserts that the common question in relation to the Illinois class is that "[a]ll class members had their privacy violated when Meyerkord obtained their DPPA-protected personal information in order to send advertisements to their home addresses." (R. 123, Class Cert. Mot., at 15.) As discussed, an element of Plaintiff's DPPA claim is that the personal information came from a motor vehicle record. *See Maracich*, 133 S.Ct. at 2199. As to what motor vehicle record is at issue in this lawsuit, Plaintiff asserts that when Officer Takei took information from his Illinois driver's license to enter into the iyeCrash software, Officer Takei gleaned his personal information from a motor vehicle record in violation of the DPPA. With this in mind, Meyerkord argues that Plaintiff cannot satisfy the predominance requirement for the Illinois class because individual questions will "overwhelm questions common to the class" due to the lack of standardized procedures for completing crash reports in Illinois. In particular, Meyerkord argues that because there is no standardized procedure in Illinois as to how law enforcement officers gather the information they insert into crash reports, any trial based on the Illinois class would be consumed by questions individual to each crash report, such as whether the individuals involved in the accident provided the officers with relevant personal information or whether the officers gathered the personal information from an Illinois driver's license.

More specifically, Meyerkord explains that Illinois law requires law enforcement officers to complete crash reports whenever a traffic accident results in injury, death, or property damage in excess of certain amounts and, according to the United States Department of Justice, Bureau of Justice Statistics, Illinois has approximately 877 state and local law enforcement agencies.[3]

---

[3] https://www.bjs.gov/content/pub/pdf/csllea08.pdf, appendix table 6.

Based on the number of crash reports generated by the numerous Illinois law enforcement agencies during the class period, Meyerkord argues that individualized questions of whether the officer gathered the personal information from a driver's license, other state-issued identification, or the individuals in the car accidents would overwhelm the questions common to the Illinois class. To further underscore this argument, Meyerkord highlights the deposition testimony of iyeTek's founder, Salman Anwar, and Officer Takei in which they testify that the type of technology officers use to create crash reports varies throughout Illinois (and the nation), namely, that some officers' vehicles have tablets, data terminals, or laptops to aid in the preparation of crash reports, while other officers complete crash reports by hand. In this context, Anwar testified that based on his experience working with Illinois law enforcement agencies, some officers without sufficient technology ask the involved parties to write down the information and then the officers later enter that information into the iyeCrash system. (136-1, Anwar Dep., at 23, 25-26.) Anwar also testified that there are many ways information ends up on a crash report, that iyeTek does not track "how the source of the content gets on a crash report," and that driver's license numbers "are not a required field in some crash reports." (*Id*. at 27-28.)

Based on his experience as a Schaumburg police officer, Officer Takei testified that some officers obtain the driver's licenses from the individuals involved in an accident and enter the personal information into a computer in their vehicle. (R. 136-2, Takei Dep., at 19-20, 43-44.) Office Takei also testified that the creation of crash reports is individualized because "[e]very situation is dynamic" and "no two crashes, as similar as they may be, are going to be exactly the same." (Takei Dep., at 15.) Further, Officer Takei stated that there are no specific guidelines on

how to respond to traffic accidents because there are "too many variables on each individual situation." (*Id*.) Officer Takei, for example, testified that part of his process is to take the driver's license and insurance information back to his police car and then run the person's information on the Law Enforcement Agencies Data System ("LEADS") to determine whether the license is valid, suspended, or expired. (*Id*. at 22-23.) Nonetheless, Officer Takei also testified that there is no standard operating procedure that requires other police officers in the Schaumburg Police Department to follow the same steps he does.[4] (*Id*. at 41.)

In response, Plaintiff asserts that Meyerkord's evidence "demonstrates that all crash reports contain personal information from motor vehicle records, and the only reasonable inference is that the sophisticated attorneys of Meyerkord were well aware of this fact when they obtained the reports for solicitation purposes." (R. 141, Pl.'s Reply Brief, at 3-4.) In support of this assertion, Plaintiff argues that the presence of an Illinois driver's license number on a crash report raises an inference that the crash report contains information from a motor vehicle record. In making this argument, Plaintiff relies upon his related lawsuit in *Pavone v. Law Offices of Anthony Mancini, Ltd.,* in which Judge Kennelly concluded at summary judgment:

> It is undisputed that Mancini obtained all of the information he had about Pavone from the crash report. And the Court has already concluded that the crash report, itself, is not a motor vehicle record. So the question is whether there is evidence from which a reasonable jury could find that Mancini knew that any of the information he had obtained came from a motor vehicle record, specifically from a driver's license. The only evidence before the Court from which one may draw such an inference is the information itself; Pavone has offered no evidence that Mancini knows how crash reports are created in general or how this crash report was created in particular. Of the various items of information at issue, the only

---

[4] Plaintiff misrepresents Officer Takei's deposition testimony when he argued that asking for a driver's license and proof of insurance at the scene of an accident is standard police protocol that happens in every instance. (Class Cert. Mot., at 5.)

10

> item whose very nature would permit a reasonable inference of knowledge of its source is Pavone's driver's license number. Specifically, a reasonable jury could find that it would be readily apparent to anyone in Mancini's position that a driver's license number comes from a driver's license – that is, from a motor vehicle record as the DPPA uses that term. The same cannot be said about the other information that Mancini obtained via the crash report, specifically, Pavone's name, address, date of birth, and telephone number. Absent any evidence other than the information itself, no reasonable jury could find that Mancini would have known from the nature of this information on the crash report that it came from Pavone's driver's license as opposed to, for example, verbally from Pavone himself.

*Pavone,* 205 F. Supp. 3d at 967-68. Judge Kennelly based his conclusion – in part – on the specific facts of Plaintiff's case reasoning that because "he gave the officer his driver's license[,] there is evidence supporting the proposition that Pavone's license was the source of the information." *Id*. at 965.

Plaintiff's reliance on the summary judgment ruling in *Mancini* does not rebut Meyerkord's factually supported argument that individualized questions pertaining to how each Illinois officer gathers information to create a crash report would predominate the questions that are common to the class because not every individual in the Illinois class will have given his or her driver's license to the police officer creating the crash report. Moreover, Plaintiff's argument that he has presented evidence "that the best practice by law enforcement is to always require a driver to produce a driver's license at the scene of a crash" fails to recognize the reality of creating crash accident reports in the approximately 877 separate law enforcement agencies in Illinois.[5] Also, Plaintiff's argument that Meyerkord has failed to produce evidence that the different ways police officers create crash reports have actually occurred with respect to any

---

[5] Plaintiff sets forth the National Highway Traffic Safety Administration's Model Minimum Uniform Crash Criteria and the State of Illinois Traffic Record Assessment in support of his "best practice" argument. (R. 123-5, Exs. 4, 5.)

class member fails to recognize that Plaintiff carries the burden of demonstrating compliance with Rule 23 by a preponderance of the evidence, *see Mulvania,* 850 F.3d at 859, and Plaintiff's evidence of the "best practice" does not fulfill this requirement under the circumstances. Therefore, Plaintiff has failed to establish the predominance requirement pursuant to Rule 23(b)(3) as to the Illinois class due to the significant individualized questions concerning how each officer gathers DPPA-protected information for crash reports or if the officer gathered DPPA-protected information in the first instance.

      **B.**      **Nationwide Class**

In his motion for class certification, Plaintiff also contends that the common question in this lawsuit for the nationwide class is whether iyeTek knowingly violated the DPPA "when it sold crash reports to law firms immediately after (within 24 hours) when they were completed, when the law firm purchaser did not have the names and addresses of the persons involved in the accident or the crash report number." (Class Cert. Mot., at 15.) In response to this assertion, iyeTek first argues that Plaintiff must prove that it knew of the law firm's impermissible use as to each crash report. In making this argument, iyeTek does not address or reconcile the Seventh Circuit's conclusion that knowledge of a law firm's impermissible use is not required under the DPPA because "[v]oluntary action, not knowledge of illegality or potential consequences, is sufficient to satisfy the mens rea element of the DPPA." *Senne*, 695 F.3d at 603.

As with Meyerkord, iyeTek's better argument is that whether crash reports contain personal information from a motor vehicle record is an individualized inquiry that would predominate over questions common to the class. Indeed, each state has its own statutes and regulations regarding the preparation and disclosure of accident reports. *See, e.g.*, MCLS

257.503(1); Fla. Stat. § 316.066(2)(a). Equally important, undisputed evidence in the record reveals that iyeCrash software is only available in 14 states and that not all law enforcement agencies within each state use the software. (R. 129-1, Anwar Decl. ¶ 13.) Furthermore, for law enforcement agencies that use iyeCrash software, each agency has different technological capabilities and may use iyeCrash in different ways. (*Id*. ¶ 14.) Also, because iyeTek does not track "how the source of the content gets on a crash report," and that driver's licenses "are not a required field in some crash reports" – how officers in each law enforcement agency gather the information on crash reports is not readily available. Although courts cannot reject a motion for class certification based on a plaintiff's failure to prove a reliable and administratively feasible way to identify class members, *see Mullins v. Direct Digital,* 895 F.3d 654, 657-58 (7th Cir. 2015), the lack of accessibility to information regarding the source of crash report information underscores the individualized inquires necessary to establish whether law enforcement officers obtained personal information from a motor vehicle record, which is an essential element to prove a DPPA violation. *See Maracich*, 133 S.Ct. at 2199; *Graczyk*, 660 F.3d at 277. Moreover, as Plaintiff's own circumstances reveal, not every individual involved in a car accident possesses a driver's license such as his young son.

In addition, iyeTek posits that the Court would need to examine the permissibility of each law firm's use of the disclosed information to determine whether the DPPA permitted that law firm's use – another element underlying a DPPA violation. *See Maracich*, 133 S.Ct. at 2199. Specifically, iyeTek points to the fourteen exceptions to the DPPA's general ban on disclosure in 18 U.S.C. § 2721(b), arguing that a law firm could purchase an accident report for a variety of lawful reasons, such as when representing a party who was involved in a car accident. In

13

response, Plaintiff argues that "there is no question that the Meyerkord law firm used crash reports for impermissible solicitation purposes," and "it can be inferred that other law firms which used the same process of procurement as Meyerkord also had no permissible purpose for the information on the crash reports." (Reply Brief, at 20.) Plaintiff further asserts that iyeTek's argument goes to the merits of this lawsuit. Not only is Plaintiff's inference about other law firms' conduct based on an unsupported inference, namely, that these other firms used the same process as Meyerkord, but the class certification inquiry often "entail[s] some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 350-51. Accordingly, Plaintiff's arguments are misplaced. As with the Illinois class, Plaintiff has failed to carry his burden in respect to the predominance requirement under Rule 23(b)(3) for the nationwide class because individualized issues are more prevalent than common ones. *See Tyson Foods*, 136 S. at 1045.

## II. Typicality

The Court next turns to whether Plaintiff has fulfilled Rule 23(a)'s typicality requirement in which he must show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To meet this requirement, the class representative's claim must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)); *see also Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). Some factual distinctions between the class representative's claims and those of other class members do not defeat typicality, but the representative's claims must "have the same essential characteristics as the claims of the class at

large." *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008) (quoting *Oshana*, 472 F.3d at 514). The typicality requirement is designed to ensure that there is "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.,* 633 F.3d 574, 586 (7th Cir. 2011). Typicality overlaps with commonality. *See id.*

Here, Meyerkord and iyeTek argue that Plaintiff's DPPA claims do not have the same essential characteristics as the class claims. The Court agrees. To clarify, Defendants assert that Plaintiff's claims are different from other class members' claims because he bases his DPPA claim on Officer Takei using his driver's license to create the iyeCrash report, whereas not every individual involved in a car accident possesses a driver's license, such as his young son. Furthermore, as Meyerkord points out, Plaintiff's typicality argument rests on the unsupported assertion that all crash reports that Meyerkord obtained for its marketing campaign contained DPPA-protected personal information. As discussed above, evidence reveals that police officers in Illinois – and throughout the country – prepare iyeCrash reports using various sources of information and not necessarily from a driver's license like Plaintiff's claim. In short, Plaintiff cannot show that his claim arises from the same event or course of conduct as all class members. *See, e.g., Muro*, 580 F.3d at 492; *Oshana,* 472 F.3d at 514. As such, Plaintiff has not established the typicality requirement under Rule 23(a)(3).

### III. Rule 23(b)(2)

Plaintiff also seeks to certify the Illinois and nationwide classes under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is

15

appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Rule "operates under the presumption that the interests of the class members are cohesive and homogenous such that the case will not depend on adjudication of facts particular to any subset of the class." *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000); *see also Wal-Mart*, 564 U.S. at 360 ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'") (citation omitted). Rule 23(b)(2) classes require that the contemplated equitable relief be "appropriate respecting the class as a whole" and "final." *Karman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011).

As with Rule 23(b)(3), Plaintiff must first satisfy the elements under Rule 23(a), and as discussed above, Plaintiff has failed to satisfy the typicality requirement pursuant to Rule 23(a). *See McCaster,* 845 F.3d at 800. Moreover, Plaintiff cannot establish that Defendants' conduct can be "enjoined or declared unlawful only as to all of the class members or as to none of them.*" Wal-Mart*, 564 U.S. at 360. As discussed, not all law firms use iyeTek's crash reports for impermissible purposes, including when the law firm is representing a client in litigation. *See* 18 U.S.C. § 2721(b)(4). Likewise, there is evidence in the record that not every iyeCrash report obtained by law firms contains personal information from a motor vehicle record.

Equally important, certification under Rule 23(b)(2) is "permissible only when monetary relief is incidental to the equitable remedy." *Lipton v. Chattem, Inc.,* 289 F.R.D. 456, 461 (N.D. Ill. 2013) (quoting *Jefferson v. Ingersoll Int'l, Inc.,* 195 F.3d 894, 898 (7th Cir. 1999)). Here, Plaintiff seeks "compensation in the form of $2,500 in liquidated damages for every class

member against every defendant who violated that class member's DPPA rights," in addition to injunctive relief. Moreover, Plaintiff seeks injunctive relief that iyeTek has already addressed for the most part. Specifically, it is undisputed that iyeTek terminated Meyerkord's commercial iyeCrash account shortly after Plaintiff's car accident due to it violating the terms and conditions of its agreement with iyeTek. (Anwar Decl. ¶ 27, Ex. H, 2/5/15 email exchange.) Similarly, iyeTek's commercial account agreement prohibits the use of accident reports for commercial solicitation purposes and iyeTek's web portal contains the same solicitation prohibition. (*Id.* ¶¶ 22, 23, Ex. L, Meyerkord Authorize Transaction Application & Agreement, Ex. N.) As such, Plaintiff's request for injunctive relief is clearly incidental to the monetary relief he seeks. *See Jefferson,* 195 F.3d at 898 ("If Rule 23(b)(2) ever may be used when the plaintiff class demands compensatory or punitive damages, that step would be permissible only when monetary relief is incidental to the equitable remedy."). Consequently, the Court denies Plaintiff's motion for certification under Rule 23(b)(2).

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion for class certification.

**DATE:** May 22, 2017

**ENTERED:**

*[signature]*

**AMY J. ST. EVE**
**United States District Court Judge**